Anthony W. **BRYANT** et al., Plaintiffs,

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association, Defendant.**

**No. 75 C 1321.**

United States District Court, N. D. Illinois, E. D.

Jan. 23, 1976.

---

**5.** Brief in Support of Motion for New Trial, at 12 (emphasis added).

Quarles & Brady, Milwaukee, Wis., Edmund J. Burke, Chicago, Ill., for plaintiffs.

Steven Bazer, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

Plaintiffs in this diversity action were the owners of 67,835 shares of the $10 par value capital stock of the Suburban Trust & Savings Bank of Oak Park, Illinois ("Suburban"). They pledged their shares as collateral to secure the repayment of certain loans advanced by defendant, American National Bank & Trust Company of Chicago. On December 2, 1974, defendant sold the pledged shares. In Count I plaintiffs complain that the sale was not commercially reasonable as required by *Ill.Rev.Stat.* ch. 26, § 9–504(3) (1973), and seek $1,400,000 in damages. In Count II plaintiffs allege that the shares were improperly sold because the loan in default was not one of those for which the shares were pledged. Count III challenges defendant's computation of the attorneys' fees allegedly incurred in the foreclosure and sale of the shares. Defendant answered and raised an affirmative defense to the allegations in Count I. Plaintiffs moved to strike this defense pursuant to *Fed.R. Civ.P.* 12(f), and defendant moved for summary judgment on Count I, urging the defense in support of its motion. These motions are now ready for decision on the lengthy memoranda submitted by the parties.

### I. Facts

In early 1973, plaintiffs, together with two others, Robert Nanz and Steven Haughey, borrowed $5,025,400 from defendant to finance the purchase of 96,-908 shares of Suburban's stock. Of these 96,908 shares, 67,835 were purchased by plaintiffs. The block of shares owned by the 10 individuals represented a controlling interest in Suburban. The borrowers then pledged and cross-pledged the shares as security for the repayment of the loans. As a result, each borrower's shares served as collateral for his loan and the loans of the other

nine debtors. Moreover, each debtor executed a guaranty of the total amount borrowed. In August, 1974, defendant released 100 of the pledged shares.

In April of 1974, Nanz borrowed an additional $250,000 for personal expenses and repledged his 19,282 shares as security for this new loan from defendant. Plaintiffs assert that they did not know of or consent to this loan, and that their shares were not repledged as collateral for it. In May, 1974, Nanz, Haughey, and two of the plaintiffs defaulted on the first loan. Defendant's first memorandum, App. A, p. 4. Nanz also failed to make the payments on the second loan, although the papers do not show a definite date for his default. On July 16, 1974, defendant demanded payment from Nanz of the total amount due and notified him that his 19,282 shares would be sold if payment was not forthcoming. *Id.* Shortly thereafter, Nanz filed a petition for an arrangement pursuant to Chapter XII of the federal bankruptcy laws and asked the court to restrain the sale of any of the shares in the controlling interest block. Anthony Bryant, a plaintiff here, filed an affidavit in support of Nanz's request for the restraining order. Because the bankruptcy court doubted its jurisdiction over the shares owned by the other borrowers, Bryant agreed to secure the written consents of the others to the restraining order. Bryant obtained the consents with little difficulty, as the sale of the shares as a block would command a higher price than the aggregate of separate sales of each borrower's shares. Defendant's first memorandum, App. A, pp. 6–7.

The temporary restraining order was vacated on September 5, 1974 by the agreement of all concerned. At that time the parties further agreed that no sale would take place before October 1. At a hearing on October 25, the bankruptcy court approved the sale of Nanz's shares pursuant to certain conditions, one of which was that the entire block of shares would be sold as a unit. *Id.* App. Q. Defendant conducted the sale on December 2 and as the only bidder,

purchased the block for $5,239,550.12, or $54.26 per share. Complaint, ¶ 17. Plaintiffs now object to the sale as commercially unreasonable. Defendant, however, alleges that because it sold the shares pursuant to the bankruptcy court's order of October 25, the sale is conclusively deemed commercially reasonable, *Ill.Rev.Stat.* ch. 26, § 9–507(2) (1973). Plaintiffs moved to strike this affirmative defense, arguing that the court approved only the terms of the sale of Nanz's shares, and not the terms of the sale of their shares.

## II. Plaintiffs' motion to strike

The nub of this controversy is the interpretation and application of a clause in § 9–507(2), which provides:

> A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable . . . .

By their motion, plaintiffs insist that a secured creditor cannot invoke that protection of this provision unless the court has jurisdiction of the collateral and specifically approves its sale. But what plaintiffs assert so conclusively is precisely the issue before us—whether this provision may properly be interpreted to comprehend the circumstances presented in this case. The construction of a statute is a matter of law to be resolved by the court. A. Sutherland, *Statutes & Statutory Construction* § 45.03 (C.D. Sands ed. 1973). A motion to strike a defense should be denied if the defense presents a question of law which the court should hear. 2A J. Moore, *Federal Practice* ¶ 12.21, at 2437 (2d ed. 1975). Accordingly, the motion to strike is denied.

## III. Defendant's motion for summary judgment

Defendant requests summary judgment on Count I of the complaint. In support of this motion, it argues that the bankruptcy court order which approved the sale of Nanz's shares in conjunction

with those owned by plaintiffs precludes challenge of the sale as commercially unreasonable. In effect, defendant offers a broad interpretation of the "judicial approval" clause of § 9–507(2). Plaintiffs offer a much more restrictive interpretation of the statutory language, contending that the court which approves a transaction must have jurisdiction over the collateral.

The cases and comments which address the meaning of this clause are few. Nonetheless, they yield a fair indication of the drafters' intent to afford judicially approved dispositions a conclusive presumption of reasonableness. *Ill.Rev. Stat.* ch. 26, § 9–507(2), Uniform Commercial Code Comment 2, suggests that the drafters attempted to strike an equitable balance of debtor and creditor rights upon default. Because the Code penalizes the creditor who fails to dispose of the collateral in a commercially reasonable manner, a creditor who seeks to avoid liability needs some procedure for obtaining approval of his proposed disposition. To afford him a means of protection, the drafters included the provision for judicial scrutiny.

█ One court has briefly inquired into the proper application of the provision, *In re Zsa Zsa Limited*, 352 F.Supp. 665 (S.D.N.Y.1972). In that case a referee in bankruptcy had approved a general outline of a prospective sale of the debtor's collateral. Later, a trustee in bankruptcy appeared before the referee and attacked the terms of the sale. The referee[1] confirmed the sale, and the trustee sought review in the district court. Discussing the referee's decision to confirm, the court said:

> The sale herein had the benefit of judicial guidance. While the sale was not made pursuant to a detailed plan of the referee, the hearing before the referee did pass the plans through a judicial filter. When there has been such a hearing all interests have an opportunity to comment upon the arrangement for disposition of the collateral, and this should raise the presumption that the sale is commercially reasonable. Cf. 9–507(2). 352 F.Supp. at 672.

As the court suggested, a judicial approval of a disposition of collateral is given conclusive effect not because the tribunal necessarily scrutinized all aspects of the disposition and found them reasonable, but because the hearing allowed the parties to voice their objections and to comment upon the proposed transaction. If the parties have had an opportunity for thorough discussion of the sale's terms, it is appropriate to give the court's determination of reasonableness a conclusive effect.

█ This interpretation of § 9–507(2) squares with the general policy behind Article 9 of the Uniform Commercial Code. As one commentator described it, Article 9 attempts to impede dishonest dispositions of the collateral without strangling honest transactions with red tape. Hogan, The Secured Party and Default Proceedings Under the UCC, 47 *Minn.L.Rev.* 205, 220 (1962). Thus, § 9–504 mandates a disposition which is commercially reasonable in every aspect. But to lighten the burden on the creditor, § 9–507(2) suggests "various methods to which secured parties may resort to protect themselves" from later claims that their disposition was unreasonable. 2 G. Gilmore, *Security Interests in Personal Property* § 44.5, at 1235 (1965). One of these methods is to procure approval in a judicial proceeding. If the approval emanates from a full and fair hearing, a court which "collaterally" reviews[2] the disposition's reasonableness

---

1. A hearing before a referee in bankruptcy constitutes a judicial proceeding within the meaning of § 9–507(2). *In re Zsa Zsa Limited*, 352 F.Supp. 665, 672 (S.D.N.Y.1972). Similarly, a receivership proceeding qualifies as a judicial proceeding. *Frontier Investment Corp. v. Belleville National Savings Bank*, 119 Ill.

App.2d 2, 254 N.E.2d 295, 7 UCC Rep.Serv. 243 (1969).

2. Of course a party may seek direct review of any decision approving a sale of collateral. *See, e. g., Grant County Tractor Co., Inc. v. Nuss*, 10 UCC Rep.Serv. 1104 (Wash.App.

should not attempt to further investigate the individual aspects of the sale, except to determine whether the creditor followed the approved procedures or obtained the approval through overreaching or collusion. Gilmore at 1235; Hogan at 221. To investigate more deeply is to subvert the drafters' intention that judicial approval should be conclusive on the issue of commercial reasonableness.

Although the courts recognize the theory behind the concept of judicial approval, they apparently hesitate to base their decisions on this ground alone. Instead, they look beyond the prior determination. Hence, it is often unclear whether a decision upholding a transaction is bottomed upon the prior judicial approval, or upon the reviewing court's conviction that the sale was in fact commercially reasonable. See *In re Zsa Zsa Limited, supra; Frontier Investment Corp. v. Belleville National Savings Bank,* 119 Ill.App.2d 2, 254 N.E.2d 295, 7 UCC Rep.Serv. 243 (1969). The courts' reluctance to grant conclusive effect to judicial approval from another proceeding, however, is at odds with the policy of Article 9. If all parties have had a fair opportunity to challenge a proposed disposition[3] in a prior hearing, the terms set there should be immune from attack.[4]

Thus, our task here is to determine whether plaintiffs had a full and fair opportunity to participate in the proceedings in which the terms of the sale were established, and whether the defendant followed the approved procedures. First we note that one of the plaintiffs, Bryant, voluntarily appeared in the Nanz bankruptcy proceedings and submitted an affidavit in support of Nanz's request for an order restraining defendant and all others from selling the Suburban shares involved in this case. In the affidavit Bryant said the order would give the plaintiffs time to secure a sale of the entire block at a much higher price, which would benefit the bankrupt and plaintiffs. The bankruptcy court was concerned, however, that it lacked jurisdiction to restrain the sale of any shares except those belonging to Nanz. Thus, in his affidavit, Bryant consented to the order and agreed to procure the consents of the other shareholders. Based upon Nanz's motion and Bryant's affidavit, the court restrained the sale of all the shares on July 24, 1974. Defendant's first memorandum, App. B. All of the plaintiffs then appeared through their attorneys, Donnelly and Karegeannes, and moved for a continuance until October 1 to allow them to find a buyer for the entire block of shares. The parties later stipulated to a continuance until September 5, and agreed that Nanz would submit to the court a written statement indicating whether he would agree to a sale of his shares on terms set forth in a memorandum prepared by Donnelly, which con-

1972) (Editor's Note). But if a party loses on direct appeal, or fails to take an appeal, the statute seems intended to preclude a later attack in another judicial proceeding.

3. The conclusive presumption of commercial reasonableness apparently applies not only to judicial approval of proposed dispositions, but also to judicial approval which is obtained after the creditor has disposed of the collateral. *Cf. In re Zsa Zsa Ltd.* at 671.

4. *But see* J. White & H. Summers, *Uniform Commercial Code* 994 & n. 138 (1972). These commentators suggest that the judicial approval is conclusive because the tribunal passes upon the commercial reasonableness of each aspect of the disposition. To support this conclusion, they cite *Frontier Investment* and *Old Colony Trust Co. v. Penrose Industries Corp.,* 280 F.Supp. 698 (E.D.Pa.), aff'd

398 F.2d 310 (3d Cir. 1968). As we noted above, the court in *Frontier Investment* misconstrued its duty under § 9–507(2). If prior judicial approval is obtained after a fair hearing, and there is no showing of creditor overreaching, the prior judicial approval must be given conclusive effect in a "collateral" proceeding. § 9–507(2). The reviewing court should not independently review the terms of the disposition. In contrast, the court which originally approves the transaction should examine each aspect of the sale and determine its reasonableness under the particular facts of the case. § 9–504(3). This was the situation presented to the court in *Old Colony.* Thus, the court's function under § 9–507(2) is separate and distinguishable from its function under § 9–504(3). When this difference is not perceived, confusion results.

templated a sale at approximately $55 per share. *Id.* App. G, H.

On September 5, plaintiffs again appeared through their attorneys and agreed to an order vacating the restraining order. *Id.* App. L. The parties further agreed that no sale would take place before October, and that plaintiffs' attorneys would be notified of the sale. *Id.* App. K. Finally, on October 25, 1974, the court approved the terms of a sale of Nanz's shares. By the court order of that date, Nanz's 19,292 shares were to be sold in a public auction, in the eighth floor conference room on defendant's premises, and in conjunction with a sale of plaintiffs' shares. Defendant reserved the right to bid at the sale and purchase the shares. Nanz was to have 14 days notice, and defendant was to file a report within 15 days of the sale. *Id.* App. Q. Plaintiffs were represented at the October 25 hearing but did not participate. They did not object to the testimony of defendant's expert that the entire block of Suburban shares was worth about $52 to $55 per share. Plaintiffs' reply brief, App. C, pp. 7, 9. Nor did they object to the entry of the order approving the terms of the sale, which was to be in conjunction with a sale of their shares. *Id.* p. 12.

Plaintiffs attach much significance to the court's lack of jurisdiction over their shares. It is true that subject matter jurisdiction cannot be conferred by consent, *In re Chakos*, 24 F.2d 482, 485 (7th Cir. 1928). The bankruptcy court recognized this principle and consequently the sale order speaks of plaintiffs' shares only indirectly. Defendant's first memorandum, App. Q, pp. 2–3. Nonetheless, it is quite clear that the court approved the sale of all shares as commercially reasonable. First, the record shows that the court was cognizant of its duty to review the terms of the proposed sale to determine whether they were commercially reasonable. *Id.* App. N. Moreover, from the time the Bryant affidavit was filed, the bankruptcy court and the parties were united in an effort to sell the shares as a block.

No other alternative was thereafter considered because the sale of the entire block was in the best interests of Nanz, plaintiffs, and defendant. Plaintiffs actively participated to the end that the court would approve the sale of Nanz's shares only in conjunction with a sale of their shares. The court accommodated the plaintiffs' interests and on October 25 fixed the terms of a joint sale.

To interpret this approval as limited to approval of only Nanz's share would be contrary to the facts. Plaintiffs had the requisite opportunity to object to the sale's terms, but they, although present, remained silent. As a result, the terms approved by the court must be deemed commercially reasonable. Plaintiffs may question the sale pursuant to these terms only insofar as the defendant deviated from them. In addition, plaintiffs may of course challenge the reasonableness of procedures and terms which were not included in the court's order.

Plaintiffs do question defendant's compliance with the requirement that the defendant sell the shares at a public auction, except that "public advertisement" of the sale was not required. *Id.* App. Q. According to plaintiffs, the sale was private and, hence, was in violation of the order. Plaintiffs' reply brief, p. 8. In support of their contention, plaintiffs state that: (1) the shares were of a type not customarily sold in a recognized market; (2) the shares were not the subject of widely distributed standard price quotations; and (3) defendant bought at the sale. None of these facts, however, has any bearing upon the public or private nature of the sale. Until plaintiffs allege facts which raise this issue, we will not reach it.

Plaintiffs also attack the price obtained for the shares as commercially unreasonable. According to *Ill.Rev.Stat.* ch. 26, § 9–504(3), every aspect of the disposition must be reasonable. The court order approving certain specific terms of the sale states no minimum price; hence, the price defendant obtain-

ed cannot be deemed conclusively reasonable under § 9–507(2). Plaintiffs, however, have simply alleged in the complaint that the purchase price was insufficient. They insist that the stock is worth at least $75 per share without offering any allegations to support this claim. Moreover, an inadequate purchase price unaccompanied by fraud, or mistaken or illegal practices, does not render a sale commercially unreasonable. § 9–507(2), and Illinois Code Comment. Again, until plaintiffs seriously raise the question of the unreasonableness of the purchase price and attribute this inadequacy to overreaching on the defendant's part, we cannot attempt to decide this issue.

In conclusion, the defendant's motion for summary judgment on Count I is granted as follows: (1) to the extent that the bankruptcy court order of October 25, 1974 fixed the terms of the December 2, 1974 sale of the shares as a block, that sale is deemed commercially reasonable; (2) the terms fixed in the October 25, 1974 order will be reviewed only to the extent that noncompliance, fraud, or overreaching is satisfactorily proved by the plaintiffs.