384 A.2d 301.

RHODE ISLAND HOSPITAL TRUST NATIONAL BANK *vs.*
NATIONAL HEALTH FOUNDATION.

MARCH 22, 1978.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

Joslin, J. Rhode Island Hospital Trust National Bank (the Bank) brings this civil action to recover on a guaranty by National Health Foundation (the Foundation) of the Bank's loan to Thermo Processing, Incorporated (Thermo). The case was tried to a jury in the Superior Court and after both sides had rested the trial justice granted the Bank's motion for a directed verdict. The Foundation appealed.

Inasmuch as the case comes to us on an appeal from a judgment entered after the direction of a verdict, we, like the trial justice, view the evidence and the inferences to which it is reasonably susceptible in the light most favorable to the party against whom the motion was directed.

The record so viewed discloses that on November 25, 1968, Thermo financed the purchase of heat-treating equipment by borrowing $60,000 from the Bank. That loan was evidenced by a promissory note and was secured by a perfected security interest in the equipment. It was further secured by the Foundation's guaranty that Thermo would punctually pay the principal and interest on the note as well as any expenses of collection incurred thereon.

Thermo subsequently became delinquent in its obligation to the Bank and, in the winter of 1971, went into receivership.[1] Thereupon, the Bank petitioned the receivership

---

[1] The receivership proceedings are entitled *Albert H. Cross* v. *Thermo Processing Inc.*, M.P. No. 8944, in the office of the clerk of the Superior Court for the County of Providence. Norman L. Grant, Esq., the Foundation's attorney both in these and in the receivership proceedings, was appointed temporary as well as permanent receiver.

court for leave to foreclose upon the collateral securing the loan and, in connection therewith, to execute any and all rights which it had as a secured party under the terms of the promissory note, the security agreement and the Uniform Commercial Code, G.L. 1956 (1969 Reenactment) chapters 1-9 of Title 6A. The petition was granted without objection from either the receiver or the Foundation.

Coincidentally with obtaining that permission the Bank called upon the Foundation to make good on its guaranty. When that demand was not met, the Bank determined that the time was ripe to exercise its rights under the order authorizing foreclosure. At that point, the Foundation advised the Bank that Industronics, Inc. (Industronics) had extensive experience in liquidating the kinds of equipment pledged as collateral on the Thermo loan and recommended that it be employed to dispose of the collateral through an orderly liquidation over an extended period of time. Initially the Bank was favorably disposed to that recommendation but, for reasons not fully disclosed by the record, did not ultimately employ Industronics. Instead, it engaged Barnett Carter & Co., Inc. (Carter) to dispose of the collateral at public auction.

The auction sale conducted by Carter was advertised in both the local and the Boston press and was attended by many persons, including dealers from the Western and Midwestern sections of the country. Nevertheless, the net proceeds were insufficient to pay the balance due on the loan and, according to an offer of proof made by the Foundation, were substantially less than would have been realized had Industronics been employed as a liquidator. In any event, this action is prosecuted to recover the difference between the balance due on the loan and the net proceeds of the auction sale conducted by the Carter Company.

The Foundation argues that the sale by Carter yielded a lesser sum than would have been realized had its recommendation been followed and Industonics employed, that consequently the collateral was unjustifiably impaired, and

that it was therefore discharged from liability on its guaranty. That conclusion is grounded on G.L. 1956 (1969 Reenactment) §6A-3-606(1)(b),[2] which discharges a surety from liability upon proof that collateral has been unjustifiably impaired. However, that section, as explicated by Official Comment 2,[3] states that a surety will be deemed to have waived its right to claim a discharge if it has consented to the conduct constituting the impairment.

Here the Foundation expressly agreed in the guaranty that "its liability as guarantor will be in no way affected or prejudiced by * * * any other act, indulgence or omission of said Bank * * * whereby the liability of the guarantor would or might, but for this provision have been affected or discharged."[4] There is little doubt that by this language the Foundation consented to an auction sale as an appropriate method for the disposition of the collateral. *See American Bank of Commerce* v. *Covolo,* 88 N.M. 405, 409, 540 P.2d 1294, 1298 (1975); *In re Application of Bickel,* 14 Ill. App.

---

[2]General Laws 1956 (1969 Reenactment) §6A-3-606(1)(b) reads as follows:

"(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

"* * *

"(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

[3]Official Comment 2 to G.L. 1956 (1969 Reenactment) §6A-3-606 reads as follows:

"Consent may be given in advance, and is commonly incorporated in the instrument; or it may be given afterward. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge."

[4]The Foundation also "absolutely and unconditionally" guaranteed to the Bank "the punctual payment of the principal, interest and expenses of collection," and waived "any other defense whatsoever available to a guarantor except payment in full." There is authority that a "guarantor of payment, as distinguished from a guarantor of collection, cannot avail himself of the defense that the creditor through negligence, or lack of due diligence, lost or dissipated the collateral furnished by the debtor." *United States* v. *Klebe Tool & Die Co.,* 5 Wis. 2d 392, 397, 92 N.W.2d 868, 871 (1958).

3d 813, 814-15, 303 N.E.2d 541, 543 (1973). It contends, however, that in this case such consent was vitiated by the Bank's failure to meet its obligations under §6A-1-102(3)[5] of "reasonableness" and under §6A-9-504(3)[6] of disposing of the collateral in such a way that "every aspect of the disposition including the method, manner, time, place and terms must be *commercially reasonable.*" (Emphasis added.)

Those obligations, the Foundation contends, were not satisfied because acceptance of its recommendations would have resulted in a better price being realized for the collateral. The Code in §6A-9-507(2) states, however, that the fact that a different method of disposition would have produced a better price does not of itself establish that the sale was not made in a commercially reasonable manner.

Moreover, §6A-9-507(2) also provides that "[a] disposition which has been *approved in any judicial proceeding* * * * shall conclusively be deemed to be commercially reasonable * * *." (Emphasis added.) The question then becomes whether that provision applies to the approval of the sale of the collateral by the court in the Thermo receivership proceedings. Although the receivership court was vitally concerned with the conflicting interests of the Bank as a secured party as well as those of the debtor and its other

-----

[5]General Laws 1956 (1969 Reenactment) §6A-1-102(3) reads:

"The effect of provisions of title 6A may be varied by agreement, except as otherwise provided in title 6A and except that the obligations of good faith, diligence, *reasonableness* and care prescribed by title 6A may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable." (Emphasis added.)

[6]General Laws 1956 (1969 Reenactment) §6A-9-504(3) provides in pertinent part as follows:

"Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be *commercially reasonable.*" (Emphasis added.)

creditors, that court had no legitimate concern with the conflicting interests of the Bank and the Foundation, acting as guarantor. Nevertheless, other courts have held, in similar circumstances, that judicial approval bars a later claim by a guarantor that a sale was commercially unreasonable. *See Bryant* v. *American National Bank & Trust Co.*, 407 F. Supp. 360 (N.D. Ill. 1976) (approval given in bankruptcy proceeding); *In re Zsa Zsa Ltd.*, 352 F. Supp. 665 (S.D.N.Y. 1972) (approval given in bankruptcy proceeding); *Frontier Investment Corp.* v. *Belleville National Savings Bank*, 119 Ill. App. 2d 2, 254 N.E.2d 295 (1969) (approval given in receivership proceeding).

In this case that opportunity was available to the Foundation at the foreclosure hearing. Notwithstanding, it appeared in the receivership proceedings and consented to the Bank's petition for leave to foreclose, without in any way conditioning that consent upon a particular method of disposition. Yet, even after the Bank committed itself to an auction sale, the Foundation did not seek, under §6A-9-507(1),[7] either to restrain the sale or to modify the manner in which it was to be conducted. That neglect, coupled with the Foundation's consent to the foreclosure order, precludes collateral attack on the commercial reasonableness of the sale and constitutes a waiver of the Foundation's present claim that it was discharged from liability on its guaranty. *See In re Application of Bickel*, 114 Ill. App. 3d at 815-16, 303 N.E.2d at 543-44.

The Foundation offers two additional arguments. Neither requires extended discussion. One is that it should have been allowed to present testimony at trial of the prices that could have been obtained for the collateral had the

---

[7]General Laws 1956 (1969 Reenactment) §6A-9-507(1) provides in material part as follows:

> "If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions."

Bank accepted its suggestion as to the method of disposition. Obviously, this evidence was offered in an attempt to establish the existence of a discrepancy between the value of the collateral and the prices obtained therefor. There may be cases in which evidence of that kind, particularly if the discrepancy is wide, will signal a need for a close scrutiny of the disposition. *See In re Zsa Zsa Ltd.*, 352 F. Supp. at 671. What we have already said, however, makes clear that here the circumstances were such that even a showing of a wide discrepancy would be irrelevant. Therefore, the trial justice did not err in rejecting the offered evidence.

The Foundation's remaining argument is that the denial of the Bank's motion for a summary judgment by one Superior Court justice became the law of the case and therefore precluded another justice of that court from later granting the Bank's motion for a directed verdict. There is, of course, no gainsaying that a judge should hesitate to undo either his own work or that of another judge, and to obviate that kind of situation the rule of the law of the case has developed. As applied, however, that rule does not have the finality of the doctrine of res adjudicata; rather it is a rule of policy and convenience that possesses flexibility. *Payne* v. *Superior Court*, 78 R.I. 177, 184, 80 A.2d 159, 163 (1951). Although it may bar consideration of successive motions for summary judgments as in *Columbus Ornamental Iron Works, Inc.* v. *Martin*, 103 R.I. 620, 240 A.2d 405 (1968), the rule does not apply when the second motion is based on an expanded record. Then, whether or not to consider the second motion rests in the trial justice's discretion. *Kirby* v. *P.R. Mallory & Co.*, 489 F.2d 904, 913 (7th Cir. 1973); 6 Moore, *Federal Practice* ¶56.14[2] at 363-66 (2d ed. 1976); 1 Kent, *R.I. Civ. Prac.* §56.11 at 424 (1969). A fortiori, the rule of the law of the case does not limit a trial justice's power to grant a motion for a directed verdict at the close of all the evidence if the material then before the court has changed since denial of the motion for the summary judgment.

Accordingly, the rule of the law of the case has no applicability in this action, and the fact that a motion for a summary judgment had previously been denied did not bar consideration of the motion for a direction.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court for the entry of an amended judgment reflecting interest, costs, and attorney's fees incurred by the Bank subsequent to the entry of the judgment appealed from and incident to the proceedings in this court.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

Mr. Justice Kelleher, dissenting.   It is with considerable reluctance that I must disagree with the views expressed by my Brother Joslin. However, I do not believe that the Superior Court's granting of the Bank's foreclosure petition triggered the statutory conclusive presumption of commercial reasonableness, nor do I think that the Foundation's failure to seek injunctive relief constituted a waiver of its right to challenge the reasonableness of the auction sale.

All agree that every aspect of the secured party's disposition of the debtor's collateral, including the method, manner, time, place, and terms, must be commercially reasonable, and a disposition of the collateral by a secured party "which has been approved in any judicial proceeding * * * shall conclusively be deemed to be commercially reasonable * * *." General Laws 1956 (1969 Reenactment) §§6A-9-504(3) and 6A-9-507(2). However, the presumption of reasonableness cannot arise if the judicial officer is totally oblivious to the terms and manner of the disposition when he approves the secured party's petition to foreclose. In all the cases cited by my Brother, the record clearly indicates that the approving court was conscious of the manner and terms of the proposed disposition of the collateral. Those cases present a far different picture from that in the record

before us. On March 23, 1971, the Superior Court simply granted the Bank's petition to foreclose, and at that time nobody, including the Bank, was sure of when, where, and how the collateral would be disposed.

In *Bryant* v. *American National Bank & Trust Co.*, 407 F. Supp. 360 (N.D. Ill. 1976), the bankruptcy court had approved the disposition of the collateral by public auction, specified the place thereof, and approved the secured party's right to bid, specified the type of notice required, and heard testimony concerning the value of the collateral. *Id.* at 366. Admittedly, there is language in *Bryant* which implies that a disposition will be conclusively presumed to be reasonable, even if the court had not considered all aspects of the disposition, so long as there was a hearing at which all parties had an opportunity to comment on the proposed disposition. This proposition was a gratuitous observation by the District Court judge and, in my opinion, not a correct statement of the law. There is a footnote to this proposition which bears repeating. It says:

> *"But see* J. White & H. Summers, *Uniform Commercial Code* 994 & n. 138 (1972). These commentators suggest that the judicial approval is conclusive because the tribunal passes upon the commercial reasonableness of each aspect of the disposition." *Id.* at 365, n.4.

The footnote goes on to say that

> "the court which originally approves the transaction should examine each aspect of the sale and determine its reasonableness under the particular facts of the case. §9-504(3)."

In *Bryant* the court further beclouded matters when later on in its opinion it adopted what appears to be an inconsistent position by observing that the debtors could challenge the reasonableness of procedures and terms which were not included in the bankruptcy court's order. *Id.* 366.

It is also true that, in cases like this, a receivership or bankruptcy court, if satisfied that the principal debtor has no equity in the collateral, will not usually scrutinize the reasonableness of all aspects of a proposed disposition. Such a court, however, provides a judicial hearing at which the parties are afforded an opportunity to voice objections and to comment upon the manner, method or time of the proposed disposition. So long as that opportunity is made available, the sale authorized will be deemed commercially reasonable. *Bryant* v. *American National Bank & Trust Co.*, 407 F. Supp. at 364.

The secured party need not seek judicial approval before disposing of the collateral. The Code, by its inclusion of §9-507(2), has provided a dubious secured party with a device whereby any challenge to the reasonableness of the disposition can be prospectively litigated. If the creditor seeks the benefit of the conclusive presumption, some court at some time must examine the disposition plan to see if it complies with the statutory obligation that it be commercially reasonable. Comment 2 to §9-507 confirms this belief, for it states that the judicial approval clause is designed to give a secured party the means to obtain "approval of a proposed method of disposition" as a commercially reasonable one. Professor Gilmore, an author of Article 9, forewarned secured parties that the conclusive presumption would "be a feeble reed to lean on unless the proposed action is specified in exact detail." 2 Gilmore, *Security Interests in Personal Property* §44.5 at 1235 (1965).

The record indicates that over a year elapsed between the Superior Court's granting of the foreclosure petition and the actual auction sale. During that time the Bank at some point expressed an interest in making use of the services of the Foundation's expert liquidator. Since the Superior Court merely recognized the Bank's right to foreclose and at no time approved the auction sale technique used a year later, the Bank cannot rely on that approval as supplying

conclusive proof of the reasonableness of what transpired at the auction.

My Brother's reliance on the waiver theory is equally bothersome. As I read the Code, I can find nothing in its provisions which would support the proposition that a debtor must seek injunctive relief prior to the proposed disposition in order to preserve his right to question the disposition's commercial reasonableness. To the contrary, §9-507(1) states that the proposed disposition "may" be ordered or restrained on appropriate terms and conditions and then goes on to say that if the disposition has taken place, the debtor has the right to recover damages for any loss caused by a failure to comply with the provisions of this part. If the waiver theory is correct, the damages portion of §9-507 is merely a fruitless semantical exercise. Concededly, in *In re Application of Bickel,* 14 Ill. App. 3d 813, 303 N.E.2d 541 (1973), the court commented on the debtor's inertia prior to and at the time of the sale. However, the court upheld the reasonableness of the sale only after it had examined the circumstances surrounding the disposition of the collateral.

This waiver theory is also contrary to two provisions of the Code which indicate that the obligation on a secured party to dispose of the collateral in a commercially reasonable manner may not be waived. Section 1-102(3); 9-501(3)(b). Section 1-102(3) provides that obligations of reasonableness may not be disclaimed by agreement. Section 9-501(3)(b) states that the debtor's[1] rights under §9-504(3) (i.e. to have the collateral disposed of in a com-

---

[1]The defendant, a guarantor, is included within the definition of "debtor" for the purposes of Article 9 of the U.C.C. Section 6A-9-105(1)(d); *Norton* v. *National Bank of Commerce,* 240 Ark, 143, 398 S.W.2d 538 (1966); *Atlas Thrift Co.* v. *Horan,* 27 Cal. App. 3d 999, 104 Cal. Rptr. 315 (1972); *Hepworth* v. *Orlando Bank & Trust Co.* 323 So. 2d 41 (Fla. App. 1975); *Bank of Gering* v. *Glover,* 192 Neb. 575, 223 N.W.2d 56 (1974); *T & W Ice Cream, Inc.* v. *Carriage Barn, Inc.,* 107 N.J. Super. 328, 258 A.2d 162 (1969).

mercially reasonable manner) "may not be waived or varied." The requirement that all aspects of the disposition of collateral by the secured party be commercially reasonable is mandatory and is not subject to disclaimer or limitation. *Foster* v. *Knutson*, 84 Wash. 2d 538, 527 P.2d 1108 (1974); 2 Gilmore, *Security Interests in Personal Property* §44.5 at 1232.

It is clear that the trial justice, in directing a verdict for the Bank, was relying on §9-507(2)'s proviso concerning the conclusive presumption of a sale receiving judicial approval. In sustaining the Bank's continuing objections to the Foundation's effort to demonstrate through the testimony of the liquidator the commercial unreasonableness of the auction sale, the trial justice remarked: "The order says they can sell it according to the Uniform Commerical Code, and they complied with that. I don't see how they may be punished." Later, the trial justice permitted the Foundation to make an offer of proof, which came by way of the testimony of the liquidator.

The liquidator who was present at the auction sale told the trial justice that the auctioneer sold not only the Bank's collateral but also other equipment in which the Foundation had a security interest. The Foundation had agreed to this sale because, according to the liquidator, it would "help the total package" in light of the Bank's refusal to go the liquidation route. Much of the collateral and the items in which the Foundation had a security interest consisted of heat-treating equipment. The liquidator described the auctioneer as being totally inexperienced so far as the disposition of this type of equipment was concerned. Some of the collateral items, he said, were either misidentified as to their function or sold for sums that were considerably below that which would have been realized had the collateral been disposed of by way of a liquidation sale. This witness, who had considerable experience in all phases of buying and selling this type of collateral, also indicated that the potential

of the liquidation sale lost some of its wallop when the Bank sold some of the equipment at private sales which occurred before the auction. He also stressed that a liquidation sale of the type he had proposed, which would have occurred over an extended period, would have produced considerably more revenue than that realized at a 1-day event such as an auction sale.

In this controversy there was evidence that should have been presented to the jury so that, after proper instructions, the factfinders could have reported a verdict for either side.[2] Consequently, I dissent.

*Winograd, Shine & Zacks, P.C., Cary J. Coen,* for plaintiff.

*Norman L. Grant,* for defendant.

---

[2]The majority's conclusion forecloses any meaningful discussion of just what is the effect of a creditor's failure to make a commercially reasonable disposition of the collateral. There is a division of judicial thought about whether a creditor who fails to comply with the provisions of §9-504(3) is precluded from recovering a deficiency judgment. One line of authority holds that such misconduct is an absolute bar to a deficiency. *See Leasing Associates, Inc.* v. *Slaughter & Son, Inc.,* 450 F.2d 174 (8th Cir. 1971); *Beneficial Finance Co.* v. *Reed,* 212 N.W.2d 454 (Iowa 1973); *Camden National Bank* v. *St. Clair,* 309 A.2d 329 (Me. 1973); *Aimonetto* v. *Keepes,* 501 P.2d 1017 (Wyo. 1972). A second line of authority holds that the secured creditor may recover a deficiency judgment subject to the debtor's right under §9-507(1) to recoup whatever damages are the proximate result of such wrongdoing. *Jones* v. *Morgan,* 58 Mich. App. 455, 228 N.W.2d 419 (1975). Other courts, dissatisfied that neither the arbitrary denial of a deficiency judgment nor the allowance of a deficiency judgment subject to the debtor's right to damages under §9-507 produced an entirely equitable result, have opted for a third approach. This view takes the position that where the creditor is derelict, one can presume that the collateral had a fair market value equivalent to the amount of the debt, and no deficiency will be permitted unless the creditor produces evidence to prove the reasonable amount that the collateral would have sold for at a proper sale. *United States* v. *Whitehouse Plastics,* 501 F.2d 692 (5th Cir. 1974); *Universal C.I.T. Credit Co.* v. *Rone,* 248 Ark. 665, 453 S.W.2d 37 (1970); *Community Management Association of Colorado Springs, Inc.* v. *Tousley,* 32 Colo. App. 33, 505 P.2d 1314 (1973); *Levers* v. *Rio King Land & Investment Co.,* 560 P.2d 917 (Nev. 1977); *T & W Ice Cream, Inc.* v. *Carriage Barn, Inc.,* 107 N.J. Super. 328, 258 A.2d 162 (1969).