72 P.3d 499

Jade WEMPLE, a minor, by her Next Friend, Charles H.Y. DANG, Plaintiff–Appellant/Cross–Appellee,

and

Dawn Wemple, Plaintiff–Appellee/Cross–Appellee,

v.

Dean A. DAHMAN, Association of Apartment Owners of Summer Villa, Fidelity Management, Inc., Defendants–Appellees/Cross–Appellees,

and

Richard T. Yoshida and May H. Yoshida, Defendants–Appellees/Cross–Appellants,

and

John Does 2–10, Doe Corporations 2–10, Doe Partnerships 1–10, Doe Governmental Entities 1–10, and Doe Unincorporated Associations 1–10, Defendants;

and

Association of Apartment Owners of Summer Villa and Fidelity Management, Inc., Third–Party Plaintiffs–Appellees/Cross–Appellees,

v.

Kim Mau, Gordon F. Liu and Annette K. Liu, individually and as Trustees of the Gordon F. Liu and Annette K. Liu Trust dated June 10, 1992, Hideo Yokota and Kiyoko Yokota, Third–Party Defendants–Appellees/Cross–Appellees.

No. 21497.

Intermediate Court of Appeals of Hawai‘i.

June 3, 2002.

As Amended June 10, 2002.

Certiorari Granted July 11, 2002.

James J. Bickerton, Honolulu, Bickerton, Saunders Dang & Bouslog, for Jade (William W. Saunders, Jr. and Alan B. Burdick, Honolulu, with him on the briefs).

John T. Komeiji, Honolulu, Watanabe, Ing & Kawashima, for SV Defendants (Patsy H. Kirio, Honolulu, with him on the brief).

Christopher J. Cole, Honolulu, McCorriston, Miho Miller Mukai, for Non–SV Property Owners the Yoshidas (Richard B. Miller and Lisa M. Ginoza, Honolulu, with him on the briefs).

Brenda Morris Hoernig, Honolulu, Law Office of Dean E. Ochiai, for Non–SV Property Owners Mau and the Lius (Dean E. Ochiai, Leslie R. Kop, and Shannon L. Wack, Honolulu, with her on the brief).

Michael N. Tanoue, Honolulu, Matsumoto, LaFountaine & Chow, for Non–SV Property Owners the Yokotas (Ralph R. LaFountaine, Honolulu, with him on the brief).

BURNS, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

This negligence case arises from an October 23, 1991 accident in which Plaintiff Appellant/Cross–Appellee Jade Wemple (Jade), then seven years old, emerged suddenly from behind a van parked on a privately owned road (also referred to as "the road") that ran in front of the Summer Villa condominium (the SV), where she was temporarily residing with her grandmother, and was struck and seriously injured by a pick-up truck driven by Defendant–Appellee/Cross–Appellee Dean A. Dahman (Dahman).

Jade, by her next friend, Charles H.Y. Dang, and Plaintiff–Appellee/Cross–Appellee Dawn Wemple (Dawn), Jade's mother, (collectively, Plaintiffs) subsequently filed a lawsuit [1] against: (1) Dahman; (2) Defendants–

---

1. Plaintiff–Appellant/Cross–Appellee Jade Wemple (Jade), a minor, by her next friend, Charles H.Y. Dang, and Plaintiff–Appellee/Cross–Appellee Dawn Wemple, Jade's mother, (collectively, Plaintiffs) initially filed their complaint in the Circuit Court of the First Circuit (the circuit court) on May 8, 1992 against Defendants Appellees/Cross–Appellees Dean A. Dahman and Association of Apartment Owners of Summer Villa (AOAO), as well as various John Does, Doe Corporations, Doe Partnerships, Doe Governmental Entities, and Doe Unincorporated Associations. On October 23, 1992, the circuit court granted Jade's ex parte motion to certify Defendant–Appellee/Cross–Appellee Fidelity Management, Inc. (Fidelity), AOAO's property manager at the time of the accident, as a Defendant Doe Corporation.

On October 20, 1993, by stipulation of the parties, Jade was permitted to file her First Amended Complaint, adding Defendants–Appellees/Cross–Appellants Richard T. Yoshida and May H. Yoshida (collectively, the Yoshidas) as parties, and specifically adding Fidelity as a named Defendant.

On April 11, 1994, AOAO and Fidelity (collectively, SV Defendants) filed a third-party complaint against Third–Party Defendants–Appellees/Cross–Appellees Kim Mau (Mau); Gordon F. Liu and Annette K. Liu (the Lius), individually and as trustees of the Gordon F. Liu and Annette K. Liu Trust Dated June 10, 1992 (the Liu Trust); and Hideo Yokota and Kiyoko Yokota (the Yokotas). The circuit court subsequently dismissed the complaint against the Lius in their capacity as trustees of the Liu Trust, after determining that the Liu Trust did not exist at the time of the accident.

On May 6, 1994, Jade filed a "complaint over against" Mau, the Lius, and the Yokotas, pursuant to Hawaii Revised Statutes (HRS) § 657–7.5 (1993) and Hawaii Rules of Civil Procedure Rule 14(a). HRS § 657–7.5 provides, in relevant part, as follows:

**Third-party defendants, time in which plaintiff may amend.** When a defendant, against whom action has been timely brought, brings in a third-party defendant who is or may be liable to the defendant or to the plaintiff for all or part of the plaintiff's claim against the defendant, plaintiff within thirty days after the date of filing of the third-party defendant's

Appellees/Cross–Appellees Association of Apartment Owners of the SV (AOAO) and Fidelity Management, Inc. (Fidelity), AOAO's property manager at the time of the accident (AOAO and Fidelity collectively, SV, Defendants); and (3) the following owners of properties that abutted or were located in the vicinity of the privately owned road (collectively, Non–SV Property Owners): Defendants–Appellees/Cross–Appellants Richard T. Yoshida (Mr. Yoshida) and May H. Yoshida (collectively, the Yoshidas); and Third–Party Defendants–Appellees/Cross–Appellees Hideo Yokota and Kiyoko Yokota (the Yokotas), Kim Mau (Mau), and Gordon F. Liu and Annette K. Liu (the Lius). (SV Defendants and Non–SV Property Owners will hereafter be collectively referred to as Defendant Property Owners, and Dahman and Defendant Property Owners will hereafter be collectively referred to as Defendants.)

The difficult public policy issue we must decide in this case is whether the owners of a privately owned road that has been open to the general public for at least half a century but has never been statutorily dedicated or surrendered to the county have a duty to maintain the entire privately owned road in a condition reasonably safe for pedestrians and children known to play in the area and to warn travelers on the privately owned road that children may be playing in or crossing the privately owned road. We take judicial

notice that in 1981, there were over five hundred of such privately owned roads in the City and County of Honolulu (the County) alone, many of which are major arteries or thoroughfares integral to the public road and transportation system in the County.[2]

We conclude that where a privately owned road has been impliedly dedicated to the general public as a road easement, is subject to state and county traffic control regulations, and is maintained or repaired by the county, no such duty exists on the part of the owners of the privately owned road since they have no control over the privately owned road. Accordingly, we affirm the February 7, 1995 order of the Circuit Court of the First Circuit (the circuit court), granting SV Defendants' second motion for summary judgment and Non–SV Property Owners' motion for joinder in SV Defendants' second motion for summary judgment.

We also affirm the circuit court's order denying the Yoshidas' motion for summary judgment, which was predicated on the Yoshidas' assertion that the Hawaii Recreational Use Statute (the HRUS), Hawaii Revised Statutes (HRS) chapter 520, immunized them from Plaintiffs' action.

## BACKGROUND

### A. *The Road*

The accident that prompted this lawsuit occurred on an unnamed, paved, privately

---

answer, may assert against the third-party defendant any claim, arising out of the original transaction or occurrence that is also the subject matter of the third-party plaintiff's claim against the third-party defendant, which would have been timely if the third-party defendant had been joined originally as a defendant, notwithstanding any statutory period of limitations otherwise applicable to plaintiff's claim.

2. On December 9, 1981, the City Council of the City and County of Honolulu (the County) adopted Resolution No. 81–252, which established a new policy for the maintenance of streets and roads in the County. The policy authorized the County, among other things, to: (1) "[m]aintain by either remedial patching, resurfacing or reconstruction ... those non-dedicated or non-surrendered streets shown in Exhibit A, with the exception of those streets maintained by other agencies or entities"; (2) "[m]aintain by either remedial patching or resurfacing, other non-dedicated or non-surrendered PAVED roads serving six (6) or more in-

dividually-owned parcels upon the request of abutting owners"; and (3) "[m]aintain other non-dedicated or non-surrendered UNPAVED roads serving six (6) or more individually-owned parcels with like materials, i.e., coral for coral, crushed rock for crushed rock, upon the request of abutting owners but subject to availability of equipment and manpower in the area." Exhibit A, consisting of seventeen pages, lists over 500 "arterial and collector streets" and "minor collectors and other streets" that were private and had not been dedicated or surrendered to the County, including major thoroughfares of public transportation such as Beretania Street (from University Avenue to King Street); 18th Avenue (from Kīlauea Avenue to Diamond Head Road); Haʻikū Road (from Kahekili Highway to Kamehameha Highway); Kailua Road (from the end of Pali Highway to Kalāheo Avenue); and King Street (from Middle Street to Harding Avenue). It appears from Exhibit A that the roads in many of the older, more established neighborhoods in the County, e.g., Kaimukī, are privately owned.

owned road that intersects two perpendicular streets in the Kapahulu area of the County: Olokele Avenue, which runs north to south; and Winam Avenue, which runs east to west. The privately owned road begins on Olokele Avenue, travels diagonally northeast, and ends at Winam Avenue.

The privately owned road has apparently existed since at least prior to 1948 and was originally part of a longer road (the original road) that provided access to a now-defunct artesian well lot. The existence of the privately owned road is shown on a subdivision map included in the record on appeal. Additionally, a May 17, 1948 construction plan for the proposed extension of Olokele Avenue indicates that the extension of Olokele Avenue destroyed part of the original road and separated the privately owned road from the rest of the original road.

On the eastern side of the privately owned road are the properties owned or managed, from south to north, by the Lius, SV Defendants, and the Yoshidas. The Yokotas' property, which does not abut the privately owned road, lies to the east of the property on which the SV sits (the SV site). Mau's property, which also does not abut the privately owned road, appears to have formerly abutted that part of the original road that was destroyed by the Olokele Avenue extension project in 1948. A County sewer easement runs between the SV site and the Yoshidas' property.

Between Olokele Avenue and the western side of the privately owned road is a triangular landscaped area owned by the County. This triangular area is bisected by two five-foot-wide walkways that connect Olokele Avenue to the privately owned road and provide pedestrian access to the properties along the privately owned road. The "mauka[3] walkway" leads to the portion of the privately owned road in front of the Yoshidas' property; and the "makai[4] walkway" leads to the portion of the privately owned road in front of the SV site.

The privately owned road has always remained open to pedestrian and vehicular access by the general public, and no efforts have ever been made by Defendant Property Owners to limit use of the privately owned road to only those vehicles or pedestrians needing access to properties along the privately owned road. In 1983, because the triangular area had been neglected by the County and had become an eyesore and a hazard, with vehicles illegally parked and trash dumped there, AOAO leased the area from the County and landscaped it. AOAO also obtained permission from the County to erect a waist-high hedge and fence around the triangular area to prevent vehicles from parking there.

As part of improvements made to the triangular area, AOAO had three "no parking" signs installed on the portion of the triangular area directly fronting the SV. These signs enabled AOAO to keep the portion of the privately owned road between the SV site and the triangular area fronting the SV clear and passable for fire, police, ambulance, and resident and non-resident traffic. The SV resident manager helped to enforce these "no parking" signs by asking drivers to park their vehicles elsewhere or having violating vehicles towed away.[5] Prior to 1986, AOAO's lease of the triangular area from the County was apparently canceled due to a technicality. For a short period of time after the lease expired, however, AOAO's gardener continued to maintain the entire triangular area and, thereafter, maintained only the area fronting the SV. The remainder of the triangular area was apparently maintained on a voluntary basis by an SV resident.

In 1986, the County Transportation Department advised AOAO that the "no parking" signs would be removed, unless AOAO obtained authorization from the County's

---

3. The Hawaiian word "mauka" means "inland." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary* 242 (1986).

4. The Hawaiian word "makai" means "ocean." *Id.* The "makai walkway" was thus located closer to the ocean than the "mauka walkway," which was located inland, closer to the mountain.

5. The record indicates that private towing companies would not tow vehicles parked in front of the Yoshidas' property because there were no "no parking" signs warning that parking was prohibited on that part of the privately owned road.

32

Chief Engineer for the signs to remain. Accordingly, on August 5, 1986, AOAO's then-property manager wrote to the County's Chief Engineer, seeking such authorization. By a letter dated September 8, 1986, the County's Chief Engineer responded, "[W]e have no objections to the retention of the three '[n]o [p]arking' signs on the [County's] parcel[.]"

On July 11, 1990, AOAO's then-property manager requested that the County resurface the part of the privately owned road that fronted the SV. The County Council had previously adopted a resolution authorizing the County to resurface privately owned roads that met certain criteria. *See* footnote 2, above. The County responded to the request by resurfacing the entire road, not just the portion fronting the SV.

### B. *The Owners of the Privately Owned Road*

It is not known who all the current owners of the privately owned road are. Documents in the record indicate that there are "various owners" and that fee simple ownership of the land underlying the original road was initially divided among the owners of real property with tax map key numbers 2–7–35–1, 2–7–35–7, 2–7–35–8, 2–7–35–33, 2–7–35–54, 2–7–35–66, 2–7–35–67, 2–7–35–68, 2–7–35–71, 2–7–35–72, 2–7–35–73, 2–7–35–74, and 2–7–35–75.[6] The documents also indicate that the County has a fractional ownership interest and other easement interests in the privately owned road.

With respect to the Defendant Property Owners sued by Jade, it appears to be undisputed that: (1) AOAO currently owns a 3/44th fee simple interest in the privately owned road but held only a leasehold interest in the SV site at the time of the accident[7]; (2) the Yoshidas own a 1/11th interest in the privately owned road but do not live in the apartment building that sits on their property that fronts the accident scene; (3) the Yokotas own a 1/11th interest in the privately owned road, but their property does not abut the privately owned road and is located behind the SV site, fronting Lukepane Avenue, the street that runs parallel to Olokele Avenue; (4) the Lius, whose property is located at the makai entrance of the privately owned road, own a 1/11th interest in the privately owned road; and (5) there is no indication in the record that Mau, whose property runs along Olokele Avenue and does not abut the privately owned road (but did abut the original road), owns any fractional interest in the privately owned road.

### C. *The Accident*

Prior to the accident, Jade was playing with her friend, Lina Tongotea (Lina), in the area of the mauka walkway. It is unclear what circumstances led to Jade being on the privately owned road when she was struck by Dahman's pick-up truck. Jade's complaint alleged that the accident "occurred when a motor vehicle driven by [Dahman] collided into [Jade,] who was crossing from a pedestrian right of way." During her deposition, Jade indicated that she had been playing "chase master" with Lina just before the accident and was running "in between the cars" parked on the side of the privately owned road so Lina could not catch her.[8]

---

6. According to a tax map key document in the record, the owners of eleven parcels of land, identified by the tax map key numbers for the parcels, owned a 1/11th interest in the privately owned road and the owners of two parcels of land with designated tax map key numbers owned a 1/9th interest in the privately owned road. These interests add up to more than one hundred percent interest in the privately owned road, and a comment on the document regarding the title history of the privately owned road notes that the "[i]nterests [are] incorrect".

7. The property that the Summer Villa (the SV) sits on was comprised initially of three leased parcels of land. According to Exhibit "A" of the Declaration of Horizontal Property Regime for the SV, Parcel First included an undivided 1/44th interest in the privately owned road, and Parcels Second and Third each included a 1/44th interest in "that certain [privately owned road], containing an area of 15,339 square feet, save and except for 4,776 square feet, and more particularly described in Parcel First." Thus, AOAO initially held a leasehold interest in a 3/44th interest in the privately owned road. AOAO subsequently purchased a fee interest in the land underlying the SV and thereby obtained a 3/44th interest in the privately owned road on June 4, 1992, in five separate conveyances.

8. Only a portion of Jade's deposition is in the record.

Dawn informed a police officer who was investigating the accident that she had been informed by Lina that "[a] few other kids in the parking lot were throwing rocks at Jade" and "Jade jumped to avoid from getting struck by the rocks and in doing so she was struck" by Dahman's pick-up truck.

In his deposition, Dahman testified that he was driving a truck owned by Tevita Tongotea, Lina's father, to the Tongotea residence at 2823 Winam Avenue, which is past the Yoshidas' apartment building. Prior to turning onto the privately owned road, Dahman explained, he was driving makai on Olokele Avenue and noticed "four to five" children playing in the area of the mauka walkway. A dog also "ran out into Olokele Avenue in front of the truck before [Dahman] got to the walkway." Dahman described the accident as follows:

I turned off Winam Avenue to the left, and I came down Olokele [Avenue]. I saw the children. Made the almost ·U-turn onto the private[ly owned road].[9] I was coming up here. I was going maybe 5 to 10 miles an hour. I came up along side where these vans and cars were parked. It's fairly narrow. The children are out of my view. I was going slow, because I knew they were there, and it is a private[ly owned road].

And Jade darted out from behind the van, turned, and ran straight towards the front of the truck. She was looking over her shoulder back where she was coming from. She never saw the truck. And we impacted, and the rest is basically what is in the police report.

I jumped out of the truck. She was kind of hooked to the truck for a minute, and then she fell off.

(Footnote added.)

The police officers who arrived at the scene shortly after Jade was struck were unable to locate any direct witnesses to the accident. They determined, however, that the skid marks left by the tires of Dahman's pick-up truck ̇were between four to five feet long.

Dahman's claim that he was traveling between five and ten miles per hour was initially contradicted by Samuel C. Searle (Searle), an SV resident at the time of the accident. On May 25, 1993, Searle signed a sworn affidavit attesting that on October 23, 1991, he was in his apartment on the tenth floor of the SV when he witnessed the accident. In his affidavit, Searle stated, in pertinent part, as follows:

2. On October 23, 1991, I was going in and out of the lanai of my 10th floor apartment at the [SV] when I first heard a truck driving along the private[ly owned road] fronting the [SV]. This [privately owned road] serves as access to parking for residents and visitors of the [SV] and adjacent apartment buildings and residences. I observed this truck hit a child whom I later learned was [Jade]. From the sound of the truck's brakes just prior to the accident, I believe the truck was moving at a speed of 20–30 miles per hour before it struck [Jade]. I heard the truck's brakes screech and I witnessed [Jade] being hit and fly airborne about 10 feet back.

3. I had an unobstructed view of the accident from my tenth floor, mauka facing apartment. [Jade] was hit on the [privately owned road] adjacent to the mauka pedestrian walkway.

4. It is common knowledge among residents of the [SV] that children frequently play in the [privately owned road] fronting the [SV] and near the pedestrian walkway where [Jade] was hit.

5. It is also common knowledge among residents of the [SV] that vehicles drive along the [privately owned road] fronting the [SV] at excessive and unsafe speeds.

During a deposition taken on January 28, 1994, however, Searle contradicted the statements contained in his affidavit. Searle admitted that he had not directly witnessed the accident, just the aftermath of the accident. He explained that he had been in his SV

9. Throughout the proceedings below, the privately owned road on which the accident occurred was referred to variously as a "private drive-way[,]" "roadway[,]" "private road[,]" or "pri- vate roadway." For purposes of consistency, we have used the word "road" or "privately owned road" to describe the unnamed paved road on which the accident occurred.

living room on the afternoon of October 23, 1991 when he heard "a thud ... heard the car, you know, screeching, just a thud." He "[i]mmediately rushed to the balcony and seen what the—a little girl lying on the ground." When Searle was questioned about his prior affidavit, the following colloquy ensued:

[Attorney for SV Defendants:] Now, in your affidavit, you indicate that you heard the truck, based upon hearing the brakes, I guess, the sound of the truck brakes, you thought the truck was moving at 20 or 30 miles per hour?

[Searle:] I—vehicles that come into the [privately owned road] itself I mean, you can hear everything. I mean from the echo, everything echoes over there so you can pretty much hear everything from cars on Olokele [Avenue] and on the little strip of [privately owned road]. So I cannot— from the sound of the car, I mean, it could have [sic] a high revving car too.

[Attorney for SV Defendants:] Right.

[Searle:] But I can't—25 is probably an educated guess, I mean.

[Attorney for SV Defendants:] Have you ever attempted to or have you ever estimated speeds and then try to check out whether or not your speeds are accurate based upon just listening to cars, trucks, etc.?

[Searle:] Well, I don't know if you can really judge the character of a car going speeds but, you know, from the sound of engines and stuff, you can pretty much kind of guess.

[Attorney for SV Defendants:] Now, if you look at paragraph 2 of your affidavit, the last sentence: "I heard the truck's brakes screech and I witnessed [Jade] being . hit and fly airborne about 10 feet back." That's not correct, is it?

[Searle:] No because I think I was more or less coerced into trying to identify the whole witness of the account that happened. And I was more or less, you know, pretty much coerced into saying things, not as far as—

[Attorney for SV Defendants:] Okay. Let me just get in, when you say coerced, somebody was trying to get you to say some—

[Searle:] Well, not really get me but they wanted to know what really happened through the whole thing and I, you know, could recollect so much what I saw.

[Attorney for SV Defendants:] But just so it's clear, the part about witnessing [Jade] being hit, you don't recollect seeing [Jade] being hit?

[Searle:] No.

[Attorney for SV Defendants:] And flying airborne about 10 feet back, again, you didn't see—actually see her flying airborne?

[Searle:] No because if I did, then I would have witnessed the accident.

T.R. Bongartz, an accident reconstruction expert retained by Jade to analyze the accident, stated in an affidavit as follows:

5. It is my professional opinion that if [Dahman] was travelling [sic] at ten (10) miles per hour just before the accident, he would have been covering at fifteen (15) feet per second and, considering a normal perception and reaction time of 1.5 seconds, his total stopping distance after seeing [Jade] would have been approximately 27.5 feet.

6. It is my experience that speed-bumps have a tendency to slow vehicles down to five (5) miles per hour or below as the vehicles traverse the speed bump.

7. It is my professional opinion that if [Dahman] had been travelling [sic] at five (5) miles per hour (speed bump), he would have been covering at seven and one-half (7–1/2) feet per second and, considering a normal perception and reaction time of 1.5 seconds, his total stopping distance after first seeing Jade would have been approximately 12 feet, and the accident would not have occurred the way it did.

8. It is also my professional opinion that the large van which was described by [Dahman] and Ms. Heller obstructed [Dahman's] view of the walkway and of the children playing thereon.

9. It is my further professional opinion that if the large van had not obstructed [Dahman's] view of the walkway, he would

have seen Jade earlier and he would have been able to apply his brakes earlier, thereby preventing the accident as it occurred.

## RELEVANT PROCEDURAL HISTORY

### A. *The Complaint*

In Count I of their amended complaint, Plaintiffs alleged that Dahman was negligent for failing to maintain a proper lookout and ensuring that the way was clear for him to proceed. Count II maintained that Defendant Property Owners were negligent for failing to: adequately mark the accident site as a pedestrian right-of-way or crosswalk; enforce "no parking" regulations on the border of the privately owned road approaching the accident site; take appropriate measures to slow traffic on the privately owned road, including the placement of warning signs, "rumble strips," and/or speed bumps in the vicinity of the accident site; maintain the accident site in proper repair and safe condition; and warn motor vehicle operators of the dangerous and unsafe conditions of the privately owned road and of the location and existence of the pedestrian right-of-way. Count III alleged a negligence action against unidentified Doe Defendants who had parked their vehicles in the no-parking zone of the privately owned road; and Count IV alleged a loss of consortium claim by Dawn.

### B. *SV Defendants' First Summary Judgment Motion*

On April 30, 1993, SV Defendants filed a motion for summary judgment, claiming that "they [were] entitled to judgment as a matter of law because the undisputed facts establish that the area where the accident occurred was beyond the control of [SV Defendants], and consequently, they had no duty, as a matter of law, to protect [Jade] from physical harm arising therefrom."

On June 23, 1993, Jade filed a memorandum in opposition to SV Defendants' motion for summary judgment. Limiting her opposition to the "duty" issue raised by SV Defendants, she argued that SV Defendants' motion should be denied because:

1. A dangerous condition existed on the portion of the [privately owned road] admittedly controlled by [the SV] and that condition was a substantial factor in causing the accident;

2. As an owner of the fee in the property underlying the entire private[ly owned road], the [SV] had a duty to maintain the private[ly owned road] in a safe condition and is liable for injuries resulting from its failure to do so;

3. The case law cited by [SV] Defendants pertains to the duty to maintain an easement and [SV] Defendants do not hold a mere "easement"—they hold fee title to the [privately owned] road;

4. There is an issue of fact over whether [SV] Defendants assumed control over the private[ly owned road] beyond the area immediately fronting the [SV] building up to the point at which [Jade] was struck;

5. Even assuming that [Jade] was injured upon premises not owned or controlled by [SV] Defendants, a private landowner owes a duty of reasonable care to protect its invitees against foreseeable dangers on adjacent property; and

[6]. [SV] Defendants owe [Jade] a duty of care under general principles of tort law irrespective of their status as owner or occupier of land.

On June 25, 1993, the circuit court, Judge Wendell Huddy (Judge Huddy) presiding, held a hearing on SV Defendants' first motion for summary judgment. SV Defendants' attorney initially argued that although AOAO had a 3/44th fee ownership interest in the privately owned road, it did not have a right to control the area where the accident occurred:

What happened was, we were only able to do things to the portion of the [privately owned road] that was right in front of [the SV] and was [sic] never able to do anything with regard to any other portion.

And so our argument here in this motion is that if it's solely on legal ownership, that's a legal issue. But we're saying from a legal standpoint, we don't believe the law

should be such that just on the basis of the fact that we were a part owner.

Judge Huddy noted, however, that the SV residents derived a benefit from the use of the privately owned road, and although AOAO did not have exclusive control over the privately owned road, "by the fact that [AOAO is] the fee owner, [it] benefit[s]. [It] had maybe not complete control but the ability to participate in control, giving [it] a duty to warn." Judge Huddy presented the following hypothetical situation:

Okay. Let's take this factual scenario: People going 50, 60 miles an hour there, you're telling me that the—and it's a private[ly owned road], that everyone there can just ignore it? Who's going to enforce any kind of rules or—first, who should be making any rules or regulations, the City and County, the State [of Hawai'i (the State)]? Or should it be the owners who have an interest in that [privately owned road]?

SV Defendants' attorney responded:

Your Honor, I guess the problem we have is that if in fact the law is that every owner is legally responsible for every segment of that [privately owned road], then the law in this situation would be too broad. That's our position, is that you should only be responsible for that area or the portion that you have control over and that is right in front of your property in terms of this [privately owned road].

So that particular situation, it would be [2823—I Winam Avenue]. And it should be the province of that apartment building and not [the SV]. And we don't think the law should be such that everybody along that [privately owned road] is responsible for that segment of the [privately owned road] that doesn't—is not in front of their property because they don't have any ability to control it.

Judge Huddy then asked who had built the privately owned road, and SV Defendants' attorney was unable to answer. When asked how it was determined that SV Defendants had the right to control the area directly fronting the SV, SV Defendants' attorney responded that SV Defendants "did things to that portion of the [privately owned road] directly in front of [it]. They put up no parking signs, they did some other things. And I guess the [c]ourt raises a very interesting question, and I honestly do not know the answer to it."

In response, Jade's attorney argued that SV Defendants clearly derived a benefit from the use of the privately owned road. Additionally, Jade's attorney argued that SV Defendants

haven't made an adequate showing that they don't control that land. The fact that they may have asked a neighbor[,] gee, can I put something in front of your property and the neighbor said no, that's not the law. The law is if you own as a tenant in common a lot, you have a right to use that land and to control it. And if your neighbor is resisting that, then it's your obligation to do something about that beyond just asking him.

You've got a situation here where if they really believe that the neighbors share liability in this, that's what the third party practice is for. They haven't taken advantage of that.

The main reason that we brought [SV Defendants] in is because the car in question in this case was traveling over their property immediately prior to the accident. We're talking literally a second here. If you accept their definition of where their imaginary property line cuts across this [privately owned road], even then the car was speeding through their area just before that. They did absolutely nothing to control speeding in that area. The evidence shows that they knew that kids were playing there.

Judge Huddy, having heard the arguments of the parties, concluded that summary adjudication was not appropriate:

The problem is that [the SV property] is so closely connected and interrelated with the area of the accident, I don't know if one could construe it as a duty to warn, maybe it's just a notice question, a duty to take precautionary measures. More so [sic] where one can infer that there were children in the area. And I think from these facts one can even infer that the children

were not only pedestrians, but they were playing in the area.

So there may be a factual issue—there probably is a—I find there's a factual issue as to whether or not [SV Defendants], you know, should have put speed bumps, signs, and it may even extend beyond the area immediately fronting the [SV]. But I don't think it's a matter of summary adjudication. I'll deny the motion.

On July 13, 1993, Judge Huddy filed an order denying SV Defendants' first motion for summary judgment.

## C. *The Amended Complaint*

On October 20, 1993, Jade filed an amended complaint that formally added Fidelity as a Defendant and added the Yoshidas as party Defendants.

Jade claimed, *inter alia*, that SV Defendants and the Yoshidas "owned, occupied and/or maintained" the privately owned road and/or pedestrian walkway and failed to maintain it in a safe condition by "failing to enforce 'no parking' regulations on the border of the [privately owned road] approaching the accident site for approaching drivers, ... failure to place warning signs, 'rumble strips' and/or speed bumps in the vicinity of the accident site, and failure to take other reasonable steps to prevent speeding in that area."

## D. *The Yoshidas' Motion for Summary Judgment*

On March 29, 1994, the Yoshidas filed a motion for summary judgment, claiming:

1. Under [the HRUS, HRS c]hapter 520, **the Yoshidas owed Plaintiffs no duty of care to keep the premises safe or to warn of a dangerous condition on the premises;**

2. The Yoshidas **did not have notice** of any dangerous condition on the [privately owned road], and thus cannot be held negligent under *Harris v. [State]*, 1 Haw.App. 544[, 623 P.2d 446] (1981); and

3. Stepping out into traffic from between parked cars is an obvious danger that does not give rise to liability under

*Friederich v. [Dep't] of Transp.*, 60 Haw. 32, 36, 586 P.2d 1037, 1040 (1978).

(Bolded emphases in original.) On April 8, 1994, SV Defendants joined in the Yoshidas' motion.

On July 13, 1994, Jade filed her opposition to the Yoshidas' motion for summary judgment. Jade argued: (1) the HRUS does not apply to Jade's presence on the privately owned road because: (a) the HRUS contains an exception for "house guests" and Jade was a "house guest" at the time of the accident, (b) Jade was not a "recreational user" within the meaning of the HRUS because she had an independent right to use the privately owned road as her grandmother's guest, (c) the Yoshidas had no right to exclude Jade from the privately owned road and, hence, cannot be said to have "invited" or "permitted" her presence on the road within the meaning of the HRUS, and (d) the Yoshidas' motion relies on inadmissible double hearsay; (2) as landowners, the Yoshidas owed a duty of care to persons lawfully on their property, regardless of whether they were licensees or invitees; (3) the Yoshidas were on notice that children frequently played on the privately owned road and of the danger posed by this situation; (4) the Yoshidas were on notice of the need to impose and enforce no-parking restrictions to assure the safety of users of the privately owned road because (a) speeding on the privately owned road was a persistent, longstanding, and well-known problem, (b) other adjoining property owners were aware of and took some action to address safety problems on the privately owned road, and (c) the Yoshidas were on actual notice of [AOAO's] decision to impose and enforce no-parking restrictions on the privately owned road to address safety concerns; (5) even if the Yoshidas did not have actual notice of the dangerous condition, they were on at least constructive notice of the dangerous condition existing on the privately owned road; (6) for the requirement of "notice" to be satisfied, all that is needed is that the landowner be aware of the general nature of the risk of harm; and (7) the Yoshidas failed to take reasonable steps to eliminate foreseeable dangers on their premises.

The circuit court, the Honorable Melvin Soong presiding, heard arguments on the Yoshidas' motion on July 15, 1994 and took the matter under advisement. On September 23, 1994, the circuit court entered an order denying the Yoshidas' motion for summary judgment.

### E. *SV Defendants' Second Motion for Summary Judgment*

On October 24, 1994, SV Defendants filed a second motion for summary judgment that was later joined by Non–SV Property Owners. SV Defendants claimed that "based on the undisputed facts and as a matter of law, they did not have a duty to protect Plaintiffs from the kind of harm for which they now seek relief." In a memorandum in support of their motion, SV Defendants represented that "[t]he issue presented by this motion is purely a question of law: **Whether a single owner of land adjacent to a roadway which is used commonly by the public has a duty to maintain the roadway in a reasonably safe condition for public travel.**" (Bolded emphasis in original.) They explained:

It is a well-established rule of tort law that the holder of an easement, not the owner of the servient estate over which the easement lies, is responsible for failure to maintain the easement. Accordingly, issues of ownership are not pertinent to the legal issue of who has a duty to maintain the easement. Where an easement is shared by members of the general public, the responsibility for its maintenance does not pass to any single entity who owns an indivisible right to use the easement. In that situation, that owner has no power to exclude others from using the easement. Municipalities, not nearby landowners, are responsible for maintaining public thoroughfare.

(Underscored emphasis in original.)

On December 7, 1994, Jade filed a memorandum in opposition to SV Defendants' second motion for summary judgment. Jade initially argued that "[SV] Defendants' instant motion is a thinly disguised motion for reconsideration of Judge Huddy's July 12, 1993 Order Denying Summary Judgment" and must be denied because it was untimely and based upon the same factual or legal grounds that SV Defendants argued in their first summary judgment motion. Even if Judge Huddy's order could be revisited, Jade argued, SV Defendants' second summary judgment motion should be denied.

On December 9, 1994, the circuit court [10] heard arguments on SV Defendants' second motion for summary judgment. At the outset of the hearing, the circuit court queried SV Defendants' attorney as to how the second and first summary judgment motions differed. SV Defendants' attorney explained:

We have a different legal theory on this particular case saying that in this instance the facts show discovery—subsequent discovery has shown that in fact what we have is we have a public right of way and we are being—[the SV] have an easement to use that particular right of way.

We were not as of the time of the accident the owners of that right of way. And having just a non-exclusive easement to use that property doesn't impose upon the holder of the easement's duty to safeguard—make safe what all of the duties that they claim we should have.

Duty is a question of law, not a question of fact, and we feel that it is clear that under this particular case that we should get out.

The following colloquy between the circuit court and the attorney for SV Defendants ensued:

THE COURT: ... [W]hat interest does the [County] have in that [privately owned road]?

[ATTORNEY FOR SV DEFENDANTS]: I'm not sure. The [County] has paved the [privately owned road] at the request of the easement users.

From a legal standpoint, what I'm saying is, I'm not sure what exact duty they have or what their obligation is in terms of the particular [privately owned road]. But I know that they paved the [privately

---

**10.** The Honorable Dan Kochi presided over the hearing.

owned road] and they don't go around paving—..., but I know that the [County] does not pave private[ly owned roads].

I guess the important thing is that the time of the accident has to be clear, and nobody disputes that we were not the owners. [AOAO] was not an owner of that [privately owned road], the property underlying that [privately owned road].

. . . .

THE COURT: And it's owned by the—

[ATTORNEY FOR SV DEFENDANTS]: Well, its [sic] owned by people that adjoin the [privately owned road] and also people that don't even adjoin that or abut on that [privately owned road].

And the final point I wanted to raise is that all this thing about signage and all this stuff is false issue anyway. Mr. Dahman, the driver of the car, saw the kids before he made the turn. He knew the kids were there, so if you're going to say we're going to put signs and speed bumps, he knew they were there.

THE COURT: What about the issue of speed?

[ATTORNEY FOR SV DEFENDANTS]: I think that the issue of speed, their point is that somehow he was traversing over our property and he was gaining speed over our property. Well, if that's the case he may have been gaining speed back on [Olokele Avenue], wherever he was coming from, so that all of the people on [Olokele Avenue] should have put a speed bump in to regulate his speed or to somehow put signs up? That's not—that doesn't create a duty.

If that's the duty, then the [County], every time—or the State, every time there's an accident, because the person gains speed over your [privately owned road], you should have a duty somehow to put a—as a non-owner of the property now, we got to get back to the fact that we're a non-owner of the property or an easement user, somehow that creates a duty on us to control his actions, to somehow put speed bumps, signs, et cetera.

That's way too much of a duty that you're trying to impose because he traversed over in front of our property. Not

over our land because we don't own it, but he traversed in front of our property. And because of that somehow we have a duty.

THE COURT: Would it make a difference in [sic] you owned or partly owned the [privately owned road]?

[ATTORNEY FOR SV DEFENDANTS]: Yes, I think it might. I still have a problem with extending duty that far though personally. You know, I haven't researched this in depth, but personally I find it very difficult.

See, I don't see why then the [County] or the State in every instance shouldn't be sued when there's an accident dealing with excessive speed. It somehow—

THE COURT: Was there speed in this case? He claims from his deposition that he was going five to ten miles an hour.

[ATTORNEY FOR SV DEFENDANTS]: We have—what they don't tell you about [Searle] and we could supplement the record if you want—

THE COURT: But there's an affidavit by [Searle] saying he was going—

... 20 to 30 miles an hour.

[ATTORNEY FOR SV DEFENDANTS]: He says that he heard—he never saw the car before. He heard—

THE COURT: The brakes.

[ATTORNEY FOR SV DEFENDANTS]:—the brakes.

. . . .

... Then he says that he lied about other parts of his affidavit when he was presented with the affidavit by the investigator for the plaintiffs. And he lied because he felt sorry for [Jade].

And the accident, even didn't happen, he admits, [Searle] in his accident the accident doesn't even happen in front of the [SV]. The accident happens further up the [privately owned] road.

So even if you have the allegation of speed, the question of what's—I think we got to go back to what's the duty of a non-exclusive easement user over property that someone owns. And that's what [the SV] is at the time of this particular accident.

So we keep coming back—you know, we keep coming back to the—what I see as the base issue. The base issue is what is the duty of a non-exclusive easement user in terms of controlling property that he doesn't even own.

At that point, the circuit court engaged Plaintiffs' attorney in the following colloquy:

THE COURT: ... [W]hat is the defect on the [privately owned road]?

[PLAINTIFFS' ATTORNEY]: The defect on the [privately owned road] is that it's an area where children are known to play?

THE COURT: You mean that's a defect?

[PLAINTIFFS' ATTORNEY]: In conjunction with the fact that these are blind walkways which exit without crosswalks, without warning signs and without any parking restrictions. Every other crosswalk on the [County] streets has a no parking zone on either side of the crosswalk.

The purpose of that is to prevent blind entry into the [privately owned road] and to allow both the pedestrian and the driver to appreciate the pedestrian's presence at the time when it can make some difference.

Just as [Dahman] said in his deposition if I had not had my view blocked, I would have seen her coming out of the walkway. And that's pretty clear.

As far as the gaining speed issue, the fact the ... County ... and the State do set safe speeds for their highways, they put up signs and they enforce them, if the [SV] had just as it did under its building where it put in a speed bump to keep speeds below five miles an hour as testified by Ms. Heller (phonetic), if they had done that on their walkway—excuse me, on their [privately owned road], we wouldn't have had this accident.

Now, the issue of ownership versus lease is a total red herring. Hawai'i case law[, *Hao v. Campbell Estate*, 76 Hawai'i 77, 869 P.2d 216 (1994),] says "a lessee in possession rather than an owner owes a duty to the injured person."

THE COURT: So what do you expect the owners of that private[ly owned road] to have done?

[PLAINTIFFS' ATTORNEY]: Well, I think the people that own it and use it the most should have put in speed bumps, marked a crosswalk and prevented any parking in the area close to the walkways.

Now, this would have been consistent with safety standards on city roadways, and it would have prevented this accident.

THE COURT: Yes, but wasn't there a no parking sign there?

[PLAINTIFFS' ATTORNEY]: There was a no parking sign there but there's a question as to whether it was enforced because—

THE COURT: Yes, but on a city street you have a no parking sign, a car parks over there and a kid runs out from behind the car, are you telling me that because they didn't enforce the no parking sign that the City is responsible?

[PLAINTIFFS' ATTORNEY]: Well, we have a little difference there. In the City of Honolulu we have thousands of streets, literally, and we have a limited number of police officers available to go to each street and observe people parking.

In this situation, the [SV] is right there. Its resident manager is right there all day long and has an opportunity to see cars parked in front of the [SV].

THE COURT: Yes, so you're telling me that it's their duty to go out there and to call someone to tow the cars away every time a car parks there?

[PLAINTIFFS' ATTORNEY]: I'd say absolutely.

In fact, they say that's what they do. And having undertaken that obligation, they created for themselves a duty.

And the reason they undertook that obligation was, in their own words, to insure the safety of the [privately owned road]. Not just for fire trucks, but for residents and others in the area.

I think more importantly or as importantly this easement argument. Who really uses that easement more than anyone is the [SV] people. They've got many many

apartments in that high rise. Far more residents from the [SV] use that parcel of property. And we're not talking about the whole hundreds of yards ... and I would say more like hundreds of feet rather than hundreds of yards. But that section which is dominated by [the SV] and its landscaping, that's the area we're asking [the SV] to exercise control over.

And there's so many other bases for them to have a duty in this situation as we pointed out in our memo. They like to say that the public has an easement. Well, they haven't really demonstrated the public has an easement. They simply say the public uses it. And it's not clear whether, in fact, that is simply a tacit permission given to the public.

THE COURT: Can they put a chain across it?

[PLAINTIFFS' ATTORNEY]: I think they can.

Now, the public might dispute that because it's a question of fact as to whether the public also has a right to use that property.

And they may arguably say that the other users of the [privately owned road] should bear a proportional responsibility for maintaining it in a safe condition but where they, in fact, have assumed a portion of responsibility all the way up to the [privately owned road], and have taken the control themselves to enforce no parking and say we're going to kick people out if we don't like them, they have got a duty.

. . . .

THE COURT: Well, what about all of the duties of all of the owners way on the other side of the [privately owned road]?

[PLAINTIFFS' ATTORNEY]: Well, I think that's an issue of fact for the [c]ourt.

The duty is a question of law, but the extent to which they have benefitted from and exercised control over and foreseen risk on that section in front of the [SV] and Yoshidas, that's a question of fact.

And, in fact, in this case, the real duty arises from foreseeability. And they have admittedly foreseen, [SV Defendants] say[ ] we have concerns about the blind entry for pedestrians coming out of the makai walkway. That's one of the reasons we enforced no parking there. But they want to stick their hand [sic] in the sand as to the other walkway which they built, which is a little further up the [privately owned] road and say, oh, but we don't have any duty there.

Well, the law is clear, you do have a duty there because it's foreseeable the same risk is there as the makai one.

And add to that the fact that kids are known to play in this [privately owned road].

THE COURT: Yes, but the driver of the car says he saw the kids and therefore he was travelling [sic] at five to ten miles an hour and he saw [Jade] run right out in front of him—

[PLAINTIFFS' ATTORNEY]: Well, that's what he said, but we—

THE COURT:—not looking.

[PLAINTIFFS' ATTORNEY]:—have evidence-in fact—

THE COURT: What evidence?

[PLAINTIFFS' ATTORNEY]: We have [Searle's] evidence. Says he heard screeching and loud noise.

THE COURT: Yes, but what does that go to?

[PLAINTIFFS' ATTORNEY]: That goes to how fast he was going.

THE COURT: I don't know if that's admissible. Can he make a determination as to speed—

[PLAINTIFFS' ATTORNEY]: He can make—

THE COURT:—by the screeching of the brakes?

[PLAINTIFFS' ATTORNEY]: He can make an estimate. He also said there was a high—

THE COURT: Will the [c]ourt permit that?

[PLAINTIFFS' ATTORNEY]: Well, we don't know. There's a high revving sound as well to the engine.

The other thing that's important to point out is that the Yoshidas already themselves, and they rarely go to the property,

once a month or so to pick up rent. And back then they weren't even doing that. They—since they took their property over in '85, Mr. Yoshida admitted I've had concerns about safety of children playing on the [privately owned road] since I took over this property in '85.

How much more concern and foreseeability the [SV], who's been there for longer and who is there every day, should have known of this problem. It was a problem on the [privately owned road]. And regardless of whether they had any duties as owner, occupier, easement holder, they had duties under tort law once they foresaw a risk.

THE COURT: ... [T]his is not like a driveway where you drive right up to your house. This is most like a street that goes through that's used by all of the residents in the area.

[PLAINTIFFS' ATTORNEY]: But only the residents on the [privately owned road] use it for access to their driveways. There may be people that occasionally drive all the way through but it's not an easy road to use. There's parking that frequently obstructs people from turning up—there's a little dog leg (sic) area that's very narrow. It's not a right of way that people would like to use for access other than the people actually using it.

The public that does use it are children who come from Kaimuki High School and cross it to get over to [Lukepane Avenue] through the sewer easement. Cross the mauka walkway, cross the [privately owned road] and the sewer easement. That's the public use of it.

Occasionally people may stroll down that [privately owned] road, but the primary use is by [the SV] and the other residents. It doesn't have any other use. It's not an easy road to drive on.

The Yoshidas' attorney thereafter urged the circuit court to conclude that no duty existed on the part of Non–SV Property Owners because

this basically was a public highway for all intents and purposes. The neighborhood used it, the public used it, visitors to the [SV] as well as the other residents used it.

No one was excluded. The Yoshidas certainly did not exclude anyone. They did not exercise any rights of ownership over the property.

The attorneys for Mau, the Lius, and the Yokotas similarly argued that their clients had not taken any steps to preclude anybody from using the privately owned road, the privately owned road was held open to the public, there were no defects in the privately owned road, and the County had repaired the privately owned road. Additionally, Mau and the Yokotas did not even own property that directly abutted the privately owned road.

The circuit court took the case under advisement and. on December 21, 1994, issued the following Minute Order granting SV Defendants' second motion for summary judgment and Non–SV Defendants' joinders in the second motion for summary judgment:

1. THERE WAS NO DUTY ON THE PART OF ANY OF THE [DEFENDANTS] OR 3RD–PARTY [DEFENDANTS] TO HAVE REMOVED THE PARKED VEHICLE. FURTHERMORE, THE PRESENCE OF THE PARKED VEHICLE WAS NOT A PROXIMATE CAUSE OF THE ACCIDENT. [DAHMAN,] THE DRIVER OF THE TRUCK, SAW THE CHILDREN PLAYING, KNEW THAT HIS VISION OF THE CHILDREN WOULD BE BLOCKED BY THE VEHICLE AS HE DROVE ALONG THE [PRIVATELY OWNED ROAD] AND, THEREFORE, DROVE AT A SLOW SPEED. NOTWITHSTANDING HIS CAUTION, [JADE] DARTED INTO DAHMAN'S PATH.

2. [PLAINTIFFS] CLAIM [DEFENDANTS] HAD A DUTY TO WARN OF A HAZARDOUS CONDITION ON THE [PRIVATELY OWNED ROAD]; I.E., CHILDREN PLAYING ON OR NEAR THE [PRIVATELY OWNED ROAD]. HOWEVER, THE FAILURE TO WARN OF CHILDREN PLAYING IN THE AREA WAS NOT A PROXIMATE CAUSE OF THE ACCIDENT. [DAHMAN] SAW THE CHILDREN PLAYING, RECOGNIZED THE POTENTIAL DANGER AND DROVE HIS VEHICLE

ACCORDINGLY BUT THE ACCIDENT OCCURRED.

3. [PLAINTIFFS] CLAIM [DEFENDANTS] HAD A DUTY TO LIMIT THE SPEED ON THE [PRIVATELY OWNED ROAD] BY POSTING SPEED LIMIT SIGNS AND/OR CONSTRUCTING SPEED BUMPS. EVEN IF THERE WERE A DUTY TO POST SPEED LIMIT SIGNS OR CONSTRUCT SPEED BUMPS, SPEED OF THE VEHICLE WAS NOT A PROXIMATE CAUSE OF THE ACCIDENT. THE UNCONTRADICTED EVIDENCE IS THE STATEMENT OF [DAHMAN] THAT HE WAS TRAVELING AT 5–10 MPH BECAUSE HE SAW THE CHILDREN. (THE COURT DOES NOT APPRECIATE THE ATTACHMENT OF THE FALSELY SWORN AFFIDAVIT OF [SEARLE], DATED MAY 25, 1993, IN AN ATTEMPT TO CREATE AN ISSUE OF FACT. IN THE AFFIDAVIT, SEARLE STATES HE SAW THE TRUCK TRAVELING AT 20–30 MPH, SAW [JADE] GET HIT AND THROWN BACK 10 FEET. HOWEVER, IN [SEARLE'S] DEPOSITION TAKEN JANUARY 28, 1994, ATTACHED TO THE [YOSHIDAS'] MOTION FOR SUMMARY JUDGMENT FILED ON MARCH 29, 1994 [SEARLE] STATES HE DID NOT SEE THE ACCIDENT. THE FIRST TIME HE SAW THE TRUCK WAS AFTER THE ACCIDENT HAD ALREADY OCCURRED. HE ONLY HEARD THE SCREECH OF THE BRAKES AND NEITHER SAW THE TRUCK TRAVELING 20–30 MPH NOR SAW [JADE] GET STRUCK AND THROWN BACK 10 FEET. (PAGE 23—SEARLE DEPO) FURTHERMORE, HE STATES HE WAS EITHER COERCED INTO MAKING THE STATEMENTS IN THE AFFIDAVIT OR MADE THE STATEMENTS WANTING TO HELP AND GOT CARRIED AWAY. (PAGES 23, 31–32—SEARLE DEPO) NOT HAVING SEEN THE ACCIDENT AND ONLY HAVING HEARD THE SCREECH OF THE BRAKES, SEARLE'S STATEMENT WITH RESPECT TO THE TRUCK SPEED IS INCOMPETENT AND WOULD NOT BE ADMISSIBLE FOR ANY PURPOSE. THEREFORE, THE ONLY EVIDENCE OF SPEED BEFORE THE COURT IS THE DRIVER'S STATEMENT OF 5–10 MPH.)

4. [PLAINTIFFS] CLAIM THE WALKWAY IMPROVEMENT IN THE TRIANGULAR AREA NECESSITATED A CROSSWALK LEADING ACROSS THE [PRIVATELY OWNED ROAD] FROM THE WALKWAY. NEITHER THE WALKWAY IN THE TRIANGLE AREA NOR THE ABSENCE OF A CROSSWALK LEADING FROM THE WALKWAY WERE PROXIMATE CAUSES OF THE ACCIDENT. THE WALKWAY WAS NOT BEING USED AS A WALKWAY. [JADE] WAS PLAYING CHASE MASTER IN THE TRIANGLE AREA AND RUNNING AWAY TO AVOID BEING CAUGHT. THE PURPOSE OF A CROSSWALK WOULD BE TO WARN DRIVERS OF POTENTIAL PEDESTRIANS WHO MAY BE USING THE WALKWAY AND THEN CROSSING THE [PRIVATELY OWNED ROAD]. IN THIS CASE, [DAHMAN] WAS ALREADY FOREWARNED. HE SAW THE CHILDREN AND OPERATED HIS TRUCK ACCORDINGLY. NEVERTHELESS, LOOKING BACKWARDS, [JADE] RAN INTO THE [PRIVATELY OWNED ROAD] AND, STILL LOOKING BACKWARDS, [JADE] RAN TOWARD AND INTO THE TRUCK. . . . .

Although the circuit court held that there was no duty on the part of Defendant Property Owners to have removed vehicles parked on the privately owned road, the circuit court did not determine the general issue of whether Defendant Property Owners had a duty to maintain the entire privately owned road in a condition reasonably safe for pedestrians and children known to play in the area and to warn travelers on the privately owned road that children may be playing in or crossing the privately owned road. The circuit court, instead, held that even if a duty to warn of hazardous conditions, limit speed, post signs, construct speed bumps, or install a crosswalk existed on the part of Defendant Property Owners, such duty was

not the proximate cause of the accident that resulted in Jade's injuries.

On February 7, 1995, the circuit court issued its written order granting SV Defendants' motion for summary judgment and Non–SV Property Owners' motion for joinder in SV Defendants' motion for summary judgment.

### F. *Jade's Motion for Reconsideration*

On February 17, 1995, Jade filed a motion for reconsideration of the circuit court's granting of summary judgment, claiming, among other things, that the circuit court made factual rulings on issues that were not briefed. On April 28, 1995, the circuit court, the Honorable Dan T. Kochi (Judge Kochi) presiding, issued its order denying Jade's motion for reconsideration.

### G. *The Appeal and Cross–Appeal*

After a stipulation for dismissal of the claims against Dahman was filed, the circuit court entered final judgment against Plaintiffs on August 8, 1997. On August 14, 1997, Jade filed her first notice of appeal.

On October 29, 1997, however, the supreme court dismissed the appeal for lack of appellate jurisdiction, on grounds that the circuit court's final judgment did not properly dispose of all cross-claims, counterclaims, and third-party claims, in violation of *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 869 P.2d 1334 (1994). On remand, the circuit court issued a First Amended Final Judgment April 13, 1998. Thereafter, Jade timely filed a second notice of appeal on April 16, 1998, and the Yoshidas filed a cross-appeal on April 28, 1998.

### ISSUES ON APPEAL

Jade argues, *inter alia*, that the circuit court erred in: (1) "disregarding and overruling the law of the case on [the] SV's duty as established by Judge Huddy"; (2) "ruling on factual issues which were not raised in the Motion for Summary Judgment" and which were in dispute; (3) ruling that the owners of the privately owned road "did not owe a duty to protect Jade from foreseeable risks of harm, or to warn of a hazardous condition";

and (4) denying the Motion for Reconsideration because factual issues such as proximate cause were not briefed.

In their cross-appeal, the Yoshidas sought review of the circuit court's denial of their motion for summary judgment, claiming, *inter alia*, that the HRUS immunized them from any liability to Jade. HRS § 520–3 (Supp.2001).

### STANDARDS OF REVIEW

#### A. *Summary Judgment*

The supreme court has repeatedly stated:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.

*Blair v. Ing*, 95 Hawai'i 247, 252, 21 P.3d 452, 457 (2001) (citations and quotation marks omitted).

Where the circuit court has granted summary judgment based on the issue of duty, the supreme court has stated:

> The existence of duty is entirely a question of law. This court reviews questions of law under the right/wrong standard. Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it.

*Lee v. Corregedore*, 83 Hawai'i 154, 158, 925 P.2d 324, 328 (1996) (ellipses, citations, and quotation marks omitted).

#### B. *Motion for Reconsideration*

■ The supreme court has stated that the standard of review for the denial of a motion for reconsideration is an abuse of discretion. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992). "Generally, to constitute an abuse of discretion a court must have clearly exceeded the bounds of reason or disregard-

ed rules or principles of law or practice to the substantial detriment of a party litigant." *Id.*

## DISCUSSION

### A. *The Law of the Case Issue*

Initially, we disagree with Jade's contention that the "law of the case" doctrine barred Judge Kochi from granting SV Defendants' second motion for summary judgment.

The Hawai'i Supreme Court has explained that the "law of the case" doctrine refers to "the usual practice of courts to refuse to disturb all prior rulings in a particular case, including rulings made by the judge himself." *Chun v. Board of Trustees of the Employees' Retirement System [ (E.R.S.) ]*, 92 Hawai'i 432, 441, 992 P.2d 127, 136 (2000) (internal quotation marks omitted). This doctrine "is a rule of practice based on considerations of efficiency, courtesy, and comity." *Stender v. Vincent*, 92 Hawai'i 355, 362, 992 P.2d 50, 57 (2000). Thus, "[u]nless *cogent reasons* support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion." *Wong v. City & County of Honolulu*, 66 Haw. 389, 396, 665 P.2d 157, 162 (1983) (italicized emphasis in original). Moreover, where as in this case, the second judge is different, "[t]he normal hesitancy that a court would have in modifying its own prior rulings is even greater[.]" *Id.*

The supreme court has also made clear, however, that the "law of the case" doctrine "does not preclude modification of prior rulings in all instances." *Stender*, 92 Hawai'i at 362, 992 P.2d at 57. Indeed, in *Chun v. Board of Trustees of the E.R.S.*, the supreme court expressly stated:

> Law of the case does not ... have the inexorable effect of *res judicata* and does not preclude the court from reconsidering an earlier ruling if the court feels that the ruling was probably erroneous and more harm would be done by adhering to the earlier rule than from the delay incident to a reconsideration and the possible change in the rule of

law to be applied. 2 Moore, *Federal Practice*, § 12.14 p. 2266, n. 11.

*Gallas v. Sanchez*, 48 Haw. 370, 382, 405 P.2d 772, 779 (1965). In fact, it has been noted that, so long as a trial court retains jurisdiction, it always has the power to reexamine, modify, vacate, correct, and reverse its prior rulings and orders.

*Chun v. Board of Trustees of E.R.S.*, 92 Hawai'i at 441, 992 P.2d at 136 (internal quotation marks and brackets omitted).

In *Rhode Island Hosp. Trust Nat'l Bank v. National Health Found.*, 119 R.I. 823, 384 A.2d 301 (R.I.1978), the Rhode Island Supreme Court similarly held that the "law of the case" doctrine "does not have the finality of the doctrine of res adjudicata; rather it is a rule of policy and convenience that possesses flexibility." *Id.* at 829, 384 A.2d at 305. The court explained that although the doctrine "may bar consideration of successive motions for summary judgments ..., the rule does not apply when the second motion is based on an expanded record. Then, whether or not to consider the second motion rests in the trial justice's discretion." *Id.*

In this case, SV Defendants' second motion for summary judgment was brought over a year after the first motion for summary judgment had been denied and after Non–SV Property Owners had been added to the lawsuit. In the meantime, additional discovery had been conducted, which revealed, among other relevant facts, that: AOAO did not actually own any interest in the privately owned road at the time of the accident; Searle had recanted his prior statement about having witnessed the accident; and Dahman had admitted that, prior to the accident, he had seen children playing in the vicinity of the privately owned road and, consequently, drove more cautiously on the privately owned road.

Under these circumstances, we cannot conclude that the circuit court abused its discretion in considering SV Defendants' second motion for summary judgment.

### B. *Factual Issues Not Raised in SV Defendants' Second Motion for Summary Judgment*

Jade argues that the circuit court erred in "ruling on factual issues which were not

raised in SV Defendants' Motion for Summary Judgment and, hence, [were] not fully briefed by the parties." Jade points out that SV Defendants asked for summary judgment "on the grounds that, based on the undisputed facts and as a matter of law, they did not have a duty to protect [Jade] from the kind of harm for which [Plaintiffs] now seek relief." Jade asserts that nowhere in their motion did SV Defendants ask the court to make factual rulings concerning the following issues:

- [Dahman] was traveling "at a slow speed;"
- The testimony of [Searle] regarding the speed of the truck "is incompetent and would not be admissible for any purpose;"
- "Speed of the vehicle was not a proximate cause of the accident;"
- The presence of parked vehicles "was not a proximate cause of the accident;"
- "The walkway was not being used as a walkway;" or
- "[Jade] was playing chase master in the triangle area and running away to avoid being caught."

Jade maintains that "[t]he lower court's obligation on a[m]otion for [s]ummary [j]udgment is not to make factual findings, especially where there is conflicting evidence on the record." (Underscored emphasis in original.) By making factual findings on issues that had not been raised in the briefs and were therefore not challenged, Jade argues, the circuit court violated her right to due process in deciding the second summary judgment motion.

We agree with Jade that the issue of proximate cause and the factual determinations decided by the circuit court were not properly before the circuit court.

In *Thomson v. Idaho Ins. Agency, Inc.*, 126 Idaho 527, 887 P.2d 1034 (Idaho 1994), the Supreme Court of Idaho addressed an analogous situation. In *Thomson*, the only argument raised in the motion for summary judgment was that the plaintiff "failed to raise disputed material factual issues with respect to the elements of duty and breach." *Id.* at 530, 887 P.2d at 1037. In granting summary judgment, however, the trial court concluded that the plaintiff "had not shown sufficient material facts from which the court could find a genuine issue regarding the element of proximate causation." *Id.* The Supreme Court of Idaho held that this was error "because the [defendants] did not raise the issue of proximate causation in their motion and supporting evidentiary material, [and] the [plaintiffs] were not required to address this element of negligence even though they will ultimately have to prove it at trial." *Id.* In so holding, the Idaho court reasoned as follows:

This [c]ourt has consistently held that when a party moves for summary judgment, the initial burden of establishing the absence of a genuine issue of material fact rests with that party. Thus, it follows that if the moving party fails to challenge an element of the nonmovant's case, the initial burden placed on the moving party has not been met and therefore does not shift to the nonmovant. In the present case, not only was there no evidence showing a lack of proximate cause, but no argument was even offered to the district court on this element of negligence by the [defendants]. The district court improperly seized upon the proximate cause issue *sua sponte*. The burden never shifted to the [plaintiffs] to provide evidence of proximate causation because the [defendants] never raised the issue in the first place.

*Id.* at 531, 887 P.2d at 1038 (citations omitted).

In the present case, the issue of proximate cause was not raised by SV Defendants as a basis for summary judgment. Accordingly, to the extent that the circuit court granted SV Defendants' second motion for summary judgment on the basis of lack of proximate causation, the circuit court clearly erred.

## C. The Duty Issue

It is well settled in this jurisdiction that "[a] negligence action lies only when the defendant owes a duty to the plaintiff." *Hao v. Campbell Estate*, 76 Hawai'i 77, 80, 869 P.2d 216, 219 (1994). The determination of the existence of a legal duty, which "is entire-

ly a question of law[,]" *id.*, "involves complex considerations of legal and social policies, including the foreseeability and likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden upon the defendant." *Romano v. Bittner*, 157 Ill. App.3d 15, 23, 109 Ill.Dec. 856, 510 N.E.2d 924, 929 (1987) (citations omitted).

■ In analyzing whether a duty should be recognized, three basic principles guide us:

> First, ... whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant[.] Second, ... is a question of fairness that involves a weighing of the nature of the risk, the magnitude of the burden of guarding against the risk, and the public interest in the proposed solution. Third, we will not impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society.

*Hao*, 76 Hawai'i at 80, 869 P.2d at 219 (indented block formatting, citations, and quotation marks omitted).

Jade contends that since Defendant Property Owners were owners, lessees, occupiers, and users of the privately owned road, they owed a duty to maintain the entire privately owned road in a condition reasonably safe for children known to play in the area and to warn travelers on the privately owned road that children may be playing on or crossing the privately owned road.

We disagree. We conclude that the privately owned road is a public easement and, therefore, Defendant Property Owners

should not be legally obligated to maintain and repair the privately owned road and warn travelers of hazards on the privately owned road.

### 1. *The Privately Owned Road is a Public Easement.*

The public road system in Hawai'i has evolved over the years in a manner that has led to a great deal of confusion regarding the title to and responsibility for maintenance and repair of public roads. Because we believe that a historical perspective of this evolution is important in resolving the duty issue presented by this appeal, we begin by discussing briefly a history of our public road system.

Prior to the Great Mahele of 1848,[11] the people of Hawai'i, through the sovereign, owned all of the land, including roads, in the Kingdom of Hawai'i. *State v. Zimring*, 58 Haw. 106, 111, 566 P.2d 725, 729 (1977) (noting that the Constitution of 1840, promulgated by King Kamehameha III, specifically provided that "all the land from one end of the Islands to the other" belonged to Kamehameha I, "though it was not his own private property [but] ... *belonged to the chiefs and the people in common*, of whom Kamehameha I, was the head, and had the management of the landed property" (italicized emphasis in original)).

After the Great Mahele, "private roads could be constructed on private property," but "roads that were formerly public remained so." *See* S. Jaworowski, *Roads in Limbo: An Analysis of the State–County Jurisdictional Dispute* 8, Legislative Reference Bureau Report No. 11 (1989) (LRB Report No. 11). In 1892, Queen Lili'uokalani and the legislature of the Kingdom of Hawai'i enacted "The Highways Act, 1892," the predecessor to what is now codified in HRS chapter 264. This act defined what constituted "public highways," defined and estab-

---

11. The Great Mahele of 1848 reformed the land system in Hawai'i by separating and identifying "the relative rights of the king, the chiefs, and the *konohikis*, in the lands within the Islands." J. Chinen, *The Great Mahele* 15 (1955). A "konohiki" is defined, in relevant part, as a "[h]eadman of an *ahupua'a* land division under the chief[.]" M.K. Pukui & S.H. Elbert, *Hawaiian*

*Dictionary* 166 (1986). An "ahupua'a" is a "[l]and division usually extending from the uplands to the sea, so called because the boundary was marked by a heap (*ahu*) of stones surmounted by an image of a pig (*pua'a*), or because a pig or other tribute was laid on the alter as tax to the chief." *Id.* at 9.

48

lished certain rights and duties in connection with public highways, and assigned the "supervision, charge, and control of all public highways ... to the Minister of the Interior." LRB Report No. 11, at 9. Section 2 of the Highways Act, 1892 defined the following to be "public highways":

> All roads, alleys, streets, ways, lanes, courts, places, trails and bridges in the Hawaiian Islands, whether now or hereafter opened, laid out or built by the Government, or by private parties, and dedicated or abandoned to the public as a highway, are hereby declared to be public highways.
>
> All public highways once established shall continue until abandoned by due process of law.

1892 Haw. Sess. L., The Highways Act, § 2, at 68. Section 3 of the act provided that private roads could become "public highways" in the following manner:

> Any road, alley, street, way, lane, court, place, trail or bridge laid out, constructed, opened or maintained by individuals or corporations as a highway, may become a public highway by dedication or abandonment, or surrender thereof to general use by such individual or corporation; provided that the same shall be accepted or adopted by the Minister of Interior.

*Id.* § 3, at 68–69. Section 4 of the act provided that "[d]edication or abandonment of any highway, mentioned in Section 2 of this Act, may be by deed or by a surrender or abandonment; such surrender or abandonment shall be taken to be when no act of ownership by the owner thereof has been exercised within five years." *Id.* § 4, at 69. Additionally, Section 5 of the act provided that "[t]he ownership of all public highways and the land, real estate and property of the same shall be in the Hawaiian Government in fee simple." *Id.* § 5, at 69.

In *In re Application of Kelley,* 50 Haw. 567, 445 P.2d 538 (1968), the Hawaiʻi Supreme Court observed that "Hawaii is one of the few jurisdictions which have provided, at one time or another, for vesting the fee of a highway or road laid out by a private party and abandoned to the public in the central government." *Id.* at 579, 445 P.2d at 546. Acknowledging the general rule that "fee

title upon abandonment of a road by the public reverts to the owner of the underlying fee or his grantees, not to an abutting landowner who does not own the underlying fee to begin with[,]" *id.* at 578–79, 445 P.2d at 546, the supreme court stated that Hawaiʻi's rule was different since the Highways Act of 1892

> declared as "public highways" all roads existing at the time of the passage of the Act, as well as those to be built thereafter, regardless of whether such roads had been built by the Government or by private parties which had dedicated, surrendered or abandoned the roads to the Government. L. 1892, c. 47, § 2 (now R.L.H.1955, § 142–1). The ownership of all such "public highways" was to be in the Hawaiian Government in fee simple. *Id.* at § 5 (now R.L.H.1955, § 142–2).
>
> ... A careful reading of the Act shows ... that the Act prescribed a definite method of acceptance only for highways built by private parties and abandoned to the public after the passage of the Act. *Id. at § 3.* The statute does not require a formal act of acceptance for highways already existing at the time of the passage of the Act and, if originally private in nature, already abandoned to the public for a period of five years at the time of passage. *Id.* at § 4. Rather, such highways were declared "public highways" upon enactment of the statute itself. *Id.* at § 2.

*Id.* at 579, 445 P.2d at 546. *See also Maui Ranch Estates Owners Ass'n v. County of Maui,* 6 Haw.App. 414, 420, 724 P.2d 118, 122 (1986) (noting that pursuant to *Kelley,* although Section 3 of the Highways Act of 1892 "requires that a private road must be accepted or adopted by the Minister of the Interior, the supreme court has held that formal acceptance is not a requirement where a road, originally private, existed and had been abandoned for five years at the time of the act's passage"). As a consequence of the *Kelley* decision, private roads that had been abandoned to the public for a period of five years at the time of the Highway Act's passage became public highways by operation of law, even if the deed title to these "public highways" remained in private owners.

In 1905, the counties were established, and the territorial superintendent of public works was substituted for the Minister of the Interior. LRB Report No. 11, at 9.

In 1913, the legislature of the Territory of Hawai'i enacted Act 107, which transferred the "general supervision, charge and control of all public highways, roads, alleys, streets, ways, lanes, squares, courts, trails and bridges in the Territory ... from the superintendent of public works of the Territory to the several boards of supervisors or other governing bodies of the several political subdivisions of the Territory[.] 1913 Haw. Sess. L. Act 107, § 1, at 153.

The Senate Judiciary Committee's report on the bill, enacted as Act 107, stated the reason for the bill as follows:

> Ever since the beginning of county government in the Territory, there has been a great deal of confusion in regard to the streets, roads, etc., in the several counties, due to the conflict of authority and duties between the Superintendent of Public Works and the County officers. The counties and city and county have been charged with the construction, repair, and upkeep of the streets, roads, etc., while the Superintendent of Public Works has had the supervision, charge and control of the streets, roads, etc.

> This bill is designed to place the entire matter in the hands of the Boards of Supervisors of the several counties, and the City and County of Honolulu, where it properly belongs, thus doing away with all confusion and conflict of authority.

1913 Journal of the Senate 1168, 1169. Although the maintenance responsibilities for public roads was transferred to the counties, however, the title to these roads remained with the Territory. LRB Report No. 11, at 10.

In 1947, by Act 142, the legislature classified the public highways into two categories:

> (1) territorial or federal-aid highways, which are all those under the jurisdiction of the territorial highway engineer or the superintendent of public works pursuant to chapter 89 or any other law; and (2) coun-

ty highways, which are all other public highways.

1947 Haw. Sess. L. Act 142, § 1, at 251. Act 142 also clarified that

> [a]ll roads, alleys, streets, ways, lanes, trails and bridges in the Territory, opened, laid out, or built by private parties and dedicated or surrendered to the public use, are declared to be public highways. *Such dedication shall be by deed of conveyance naming the Territory as grantee*, which, in the case of a county highway, shall be delivered to the city and county or county and accepted by its board of supervisors. Such surrender shall be deemed to have taken place if no act of ownership by the owner of any such road, alley, street, way, lane, trail or bridge has been exercised for five years and when, *in the case of a county highway, in addition thereto, the board of supervisors of the city and county or county has, thereafter, by a resolution, adopted the same as a county highway.*

*Id.* § 1, at 252 (emphases added). Under Act 142, roads "opened, laid out, or built by private parties and dedicated or surrendered to the public use" are described as "public highways." Furthermore, "public highways" could become "county highways" only upon acceptance by the applicable county's board of supervisors. Despite the establishment of two classes of roads by Act 142, however, title to even "county roads" was still required to be in the name of "the Territory as grantee." *Id.* § 1, at 252, LRB Report No. 11, at 10.

In 1949, by Act 74, the Territorial Legislature amended the definition of public highways, which had been codified in 1945 Revised Laws of Hawaii § 6111, to add the following mandate on the counties:

> In case ... such road, alley, street, way, lane, trail or bridge has been constructed and completed in full compliance with the provisions of any ordinance or ordinances of the city and county or county relating to subdivision of lands, it shall be the duty of the board of supervisors of said city and county or county to accept the dedication or surrender of the same without exercise of discretion.

1949 Haw. Sess. L. Act 74, § 4, at 324–25. Act 74 also added a new statutory provision that required, in relevant part:

> Whenever any improvements have been constructed and completed by private parties in full compliance with the provisions of all applicable statutes, ordinances of any city and county or county and rules and regulations, having the force of law, of the board of water supply or other similar body of said city and county or county, relating to the subdivision of lands, it shall be the duty of the board of supervisors or other governing body of said city and county or county, notwithstanding any other provisions of law to the contrary, to accept, maintain and repair (and operate as the case may be) such improvements.

*Id.* § 1, at 324. The Senate Judiciary Committee, in urging passage of the bill that was enacted as Act 74, explained that "[a]t present, the Board of Supervisors has the discretion to accept, maintain and repair ... improvements" "constructed and completed by private parties in compliance with the provisions of any ordinance or ordinances relating to subdivision of lands[.]" 1949 Senate Journal at 484. The Committee felt "that it is only fair that when public facilities are completed in full accordance with the specifications and requirements of the various governing bodies concerned, those public facilities should be accepted, and then repaired, operated and maintained by such governing bodies for the benefit of the public." *Id.*

The House Committee on County and Municipal Affairs similarly explained:

> The proposed amendment seeks to make it mandatory upon the city and county or county to accept the dedication or surrender of road, alley, street, way, lane, trail, or bridge which have been constructed in full compliance with the provisions of any ordinance or ordinances. The amendment also imposed upon the city and county, county or any other governmental agencies the duty to accept, maintain and repair any improvements constructed and completed by private parties in full compliance with the provisions of all applicable statutes, ordinances and rules and regulations.
>
> . . . .

> Your Committee feels that the taxpayers should not be prejudiced by the refusal of the board of supervisors or other governmental agencies to accept improvements which have been constructed and completed in accordance with the existing statutes, ordinances or rules and regulations. The acceptance of such improvements will not overburden the county nor any governmental agency, but will further the general welfare and convenience of the public.

1949 House Journal at 1428.

The Highways Act of 1892, as amended, is the genesis of HRS § 264–1 (1993), which currently provides, in relevant part, as follows:

> **Public highways and trails.** (a) All roads, alleys, streets, ways, lanes, bikeways, and bridges in the State, opened, laid out, or built by the government are declared to be public highways. Public highways are of two types:
>
> (1) State highways, which are all those under the jurisdiction of the department of transportation; and
>
> (2) County highways, which are all other public highways.
>
> . . . .
>
> (c) All roads, alleys, streets, ways, lanes, trails, bikeways, and bridges in the State, opened, laid out, or built by private parties and dedicated or surrendered to the public use, are declared to be public highways or public trails as follows:
>
> (1) Dedication of public highways or trails shall be by deed of conveyance naming the State as grantee in the case of a state highway or trail and naming the county as grantee in the case of a county highway or trail. The deed of conveyance shall be delivered to and accepted by the director of transportation in the case of a state highway or the board of land and natural resources in the case of a state trail. In the case of a county highway or county trail, the deed shall be delivered to and accepted by the legislative body of a county.

(2) Surrender of public highways or trails shall be deemed to have taken place if no act of ownership by the owner of the road, alley, street, bikeway, way, lane, trail, or bridge has been exercised for five years and when, in the case of a county highway, in addition thereto, the legislative body of the county has, thereafter, by a resolution, adopted the same as a county highway or trail.

In every case where the road, alley, street, bikeway, way, lane, trail, bridge, or highway is constructed and completed as required by any ordinance of the county or any rule, regulation, or resolution thereof having the effect of law, the legislative body of the county shall accept the dedication or surrender of the same without exercise of discretion.

In *Maui Ranch Estates Owners Ass'n v. County of Maui*, 6 Haw.App. at 420–22, 724 P.2d at 123–24, this court was called upon to construe whether a private road which had not been statutorily dedicated or surrendered to the County of Maui in the manner provided in HRS § 264–1 could nevertheless become a "county highway" for county maintenance and repair purposes by "common law dedication." We concluded that HRS § 264–1 precluded a private road dedicated to public use from becoming a "county highway" without county council acceptance. We reasoned as follows:

Dedication is defined as

[t]he appropriation of land, or an easement therein, by the owner, for the use of the public, and accepted for such use by or on behalf of the public.

Black's Law Dictionary 371 (5th ed.1979). Dedication of land for public use may be achieved either by statute or by common law. Statutory dedication occurs when the statutory provisions are complied with. *City of Kechi v. Decker*, 230 Kan. 315, 634 P.2d 1099 (1981); 23 Am.Jur.2d *Dedication* § 38 (1983). Common law dedication is accomplished either expressly, as by deed, or impliedly, as by acts and conduct which manifest an intent to give the property for public use. *City of Kechi v. Decker, supra;* 23 Am.Jur.2d *Dedication* § 3 (1983).

However, before the municipality can be held responsible for maintenance, repair, and liability there must be unequivocal acceptance by the municipality. *Kelly v. City of Bethany*, 588 P.2d 567 (Okla.1978); McQuillin, *Municipal Corporations* § 33.44 (3rd ed.1983).

In the absence of statute, an offer to dedicate land to public use is not required to be accepted by public authorities; it may be accepted by the general public. If acceptance by public authorities is required by statute, it must be made by persons competent to act.

23 Am.Jur.2d *Dedication* § 45.

In the light of the provisions of [HRS] § 264–1 (1985), we hold that the doctrine of common law dedication does not convert a private roadway into a county highway. . . .

HRS § 264–1 requires that a private roadway surrendered or abandoned to public use is not a county highway unless it is adopted as such by resolution of the legislative body of the county. Essentially, HRS § 264–1 adopts the common law principle that a private roadway may be surrendered or abandoned to public use. However, the roadway does not become a county highway unless and until it is accepted by the legislative body.

A public highway is not a state highway unless it is designated for inclusion in the State Highway System under HRS § 264–41 (1976). All public highways which are not state highways are county highways or they are not public highways. See HRS § 264–1 (1976). A highway is not a county highway unless it is accepted or adopted as such by the county council. There is no evidence in the record of the designation, acceptance, or adoption of this road by the state or the county.

*Santos v. Perreira*, 2 Haw.App. 387, 390, 633 P.2d 1118, 1122 (1981).

In the instant case, as in *Santos v. Perreira, supra*, there is no evidence that the Maui County Council (council) accepted the [Upper Ulumalu Road (UUR)] as a public road. Since [the Maui Ranch Estates Owners Association's (Association)]

argument is based upon surrender or abandonment, acceptance can only be shown by a resolution of the council. HRS § 264–1. There is no evidence of such a resolution. Therefore, we are bound by the strict application of HRS § 264–1 to conclude that UUR is not a county highway.

Association argues, however, that although there was no official resolution by the council, acceptance was evidenced by the fact that [c]ounty employees maintained and repaired the road from 1919 to 1981, and it was registered on their "Index of County Roads" until the latter date. They argue that these acts by [c]ounty employees manifested acceptance of UUR as a county road.

However, under HRS § 264–1 only the county council is authorized to accept dedication of a private road. The acts of [c]ounty's employees are not evidence of the council's acceptance. *See Santos v. Perreira, supra.* A municipality's legislative body can only act officially through ordinance or resolution or by voting on a motion made at a council meeting. *Life of the Land v. City and County of Honolulu,* 61 Haw. 390, 423, 606 P.2d 866, 887 (1980). 6 Haw.App. at 420–22, 724 P.2d at 123–24 (some brackets in original, footnote omitted).

While a "public road" cannot become a "county road" by common law dedication without "unequivocal acceptance" by the applicable county under HRS § 264–1, the Hawai'i Supreme Court has recognized the common law dedication of private roads for valuation purposes. In *Territory v. Ala Moana Gardens, Ltd.,* 39 Haw. 514 (1952), *reh'g denied,* 39 Haw. 655 (1952), the supreme court held that it is well settled that the sale of lots based on maps and plans duly recorded "constitute a dedication, particularly when adopted by public officials." *Id.* at 520. The supreme court cited with approval cases from other jurisdictions that supported this position:

*Broocks v. Muirhead,* [223 N.C. 227], 25 S.E.2d 889, held that where an owner has land subdivided and platted into lots, streets and alleys, and sells lots or any of them with reference to the plat, he thereby "dedicates" streets and alleys irrespective of whether it has been opened and accepted for public use by the governing body of the city.

*Clark v. Ferguson,* [346 Mo. 933], 144 S.W.2d 116, holds that where the plat has been approved by the city council and recorded, there is a dedication to the public use which cannot be subsequently changed by the owner.

*Morrow v. Richardson,* [278 Ky. 233], 128 S.W.2d 560, holds that the laying out of a subdivision and the recording of the plat thereof showing the land divided into building lots and streets, followed by the sale of lots, amounts to an immediate dedication of such streets to the use of the purchasers of the lots and of the public, though the streets were not actually opened and there had been no formal acceptance by the city.

In the case before us there was a dedication by the former owners and approval by the city and county planning commission though there was delay in carrying out the proposed street improvements, as all improvements were delayed by the war.

When a fee is subject to easement and is taken for highway purposes, market value must be determined accordingly.

. . . .

"Where the fee of a strip in private ownership is subject to private street easements and such strip is taken for the purposes of a public highway the prevailing view is that such fee owner is entitled to nominal damages only, although there is authority to the effect that such fee owner is entitled to substantial damages measured by the value of the fee as burdened with the easement." (Nichols, *Eminent Domain,* 3d ed., vol. 4, § 12.411, p. 160.)

"Ordinarily, land in the bed of a street, being a naked, unproductive fee, useless, bereft of enjoyment and incapable of pecuniary advantage, its owner is entitled to no more than a nominal award." (*Matter of City of New York,* 278 N.Y. 163, 173, [15 N.E.2d 563 (1938)].)

39 Haw. at 520–21.

Subsequently, in *City and County of Honolulu v. Boulevard Properties, Inc.,* 55 Haw.

305, 306, 517 P.2d 779, 780 (1973), the supreme court considered an appeal by the County from a circuit court judgment in an eminent domain proceeding, awarding the defendant $150,477 for its fee simple interest in a parcel of land. The County maintained that the award was excessive because, under the holding in *Territory v. Ala Moana Gardens, Ltd.,* 39 Haw. 514, the parcel of land was encumbered by a roadway easement and its value was, therefore, nominal. Agreeing with the County's position, the supreme court held:

The holding in *Ala Moana Gardens* is that the laying out of a subdivision of land and recording of a plat thereof showing the land divided into building lots and streets, followed by sales of the building lots, amount to an immediate dedication of the streets shown on the plat to the use of the purchasers of the building lots and the public, although the streets have not been opened and accepted by the city, and that such dedication is binding on the owners who laid out the subdivision and all subsequent owners.

*The dedication mentioned in Ala Moana Gardens does not mean a statutory dedication of the street areas to the city, which imposes upon the city an obligation to maintain such areas as public streets.* That is clear from the *per curiam* of this court denying the petition for rehearing in the case. (39 Haw. 655).

*Within the holding in Ala Moana Gardens, dedication means a dedication by implication, which occurs when land is subdivided into building lots and streets, a plat showing such subdivision is recorded, and sales of the building lots shown on the plat are made.* It is stated in *Re Land Title of Yamaguchi,* 39 Haw. 608, 612 (1952), decided shortly after *Ala Moana*

*Gardens,* that, where land is subdivided and the subdivision map contains an "unmarked, undesignated parcel bearing the appearance of a roadway though not so designated", a dedication by implication occurs with respect to such parcel.

*Id.* at 306–07, 517 P.2d at 780–81 (emphases added).

▇▇▇ To summarize, HRS § 264–1 requires that before a county can be held responsible and liable for the maintenance or repair of a private road that has been dedicated, surrendered, or abandoned to public use, there must have been "unequivocal acceptance" of the private road by the legislative body of the county. *Maui Ranch Estates Owners Ass'n v. County of Maui,* 6 Haw.App. at 421, 724 P.2d at 123. That is, all the requirements for statutory dedication, abandonment, or surrender must be completed. However, a privately owned road that has not been statutorily dedicated, surrendered, or abandoned to public use by technical compliance with HRS § 264–1 may still be impliedly dedicated, surrendered, or abandoned to public use for a general roadway easement. *Territory v. Ala Moana Gardens, Ltd.,* 39 Haw. at 514.

▇▇▇ In this case, it is undisputed that the privately owned road in question was never statutorily dedicated or surrendered to the County pursuant to HRS § 264–1 [12] so as to qualify as a "county highway" and obligate the County to maintain or repair the privately owned road. However, the record on appeal indicates that the privately owned road was clearly laid out on a 1948 subdivision map accepted by the County for filing. Moreover, Defendant Property Owners have never sought to close the privately owned road to the public, which has continuously used the privately owned road as an ease-

---

**12.** We note that pursuant to HRS § 264–1(c)(2) (1993), a "[s]urrender of public highways … shall be deemed to have taken place if no act of ownership by the owner of the road, alley, street, bikeway, way, lane, trail, or bridge has been exercised for five years and when, in the case of a county highway, in addition thereto, the legislative body of the county has, thereafter, by a resolution, adopted the same as a county highway[.]" Moreover, a county's legislative body has no discretion to reject surrender of a private

road if certain conditions are met. Specifically, HRS § 264–1(c)(2) provides that "[i]n every case *where the road, alley, street, bikeway, way, lane, trail, bridge, or highway is constructed and completed as required by any ordinance of the county or any rule, regulation, or resolution thereof having the effect of law,* the legislative body of the county *shall* accept the dedication or surrender of the same without exercise of discretion." (Emphases added.)

ment for vehicular and pedestrian access. Therefore, although the privately owned road does not qualify as a county highway within the meaning of HRS § 264–1, we conclude that the privately owned road was nevertheless impliedly dedicated to the County as a road easement for the general public. *City & County v. Boulevard Properties, Inc.*, 55 Haw. at 306–07, 517 P.2d at 780–81.

> ### 2. The County Had Control Over the Privately Owned Road So It Would Not be Fair to Impose on Defendant Property Owners the Duty to Maintain or Repair the Privately Owned Road.

 Hawai'i follows the general rule that "it is the control and not the ownership [of premises] which determines the liability." *Levy v. Kimball*, 50 Haw. 497, 499, 443 P.2d 142, 144 (1968) (internal quotation marks omitted). In *Levy*, the plaintiff tripped and fell off a seawall that was owned by a Waikīkī hotel, but which the State had acquired an easement over, "for the express purpose of providing a path for public travel." *Id.* at 498, 443 P.2d at 144. The State argued that since it did not own the seawall and only had an easement right to use the seawall's top surface, it had no duty to maintain the seawall in a safe condition.

Disagreeing with the State, the Hawai'i Supreme Court initially observed that "[i]t is a well established rule that an owner of an easement has the right and the duty to keep it in repair. The owner of the easement is liable in damages for injuries caused by failure to keep the easement in repair." *Id.* at 498, 443 P.2d at 144 (citations omitted). The supreme court then went on to explain:

> [T]he rule is that "it is the control and not the ownership which determines the liability." . . . .
>
> Revised Laws of Hawaii 1955, Sec. 142–1, [the predecessor to HRS § 264–1,] relat-

ing to highways, sidewalks, parks, and use of streets, states that:

> "All roads, alleys, streets, ways, lanes, trails, and bridges in the Territory, opened, laid out or built by private parties and dedicated or surrendered to the public use, are declared to be public highways."

Although a seawall is not expressly mentioned in the above enumeration, it can be fairly implied that a seawall ... which is used as a public thoroughfare is included in the term "public highways".

*Restatement, Second, Torts* Sec. 349 [13] (1965), states in part:

> "The duty to maintain a highway in a condition safe for travel, is, in America, and in some states by statute and others by common law, placed upon the municipal subdivision which holds the highway open to the public for travel. This duty includes not only a duty to maintain the surface of the highway in a condition reasonably safe for travel, but also a duty of warning the traveling public of any other condition which endangers travel, whether caused by a force of nature, such as snow and ice, or by the act of third persons, such as a ditch dug in the sidewalk or cartway or an obstruction placed thereon * * *."

*Levy v. Kimball*, 50 Haw. at 499–500, 443 P.2d at 144–45 (footnote added).

Similarly, in the case of *Re Taxes Victoria Ward*, 33 Haw. 235 (1934), the Hawai'i Supreme Court emphasized that control, and not ownership, determines liability for negligent road maintenance. *Victoria Ward* involved a tax appeal regarding the value of a lot owned in fee by Victoria Ward but used for more than twenty-five years as a public highway by the County. The tax assessor and board of review had valued the lot at $51,022, but the tax appeal court had reduced

---

13. The language quoted by the supreme court as being from the Restatement, Second, Torts § 349 is actually Comment b. to § 349. In reality, section 349 of Restatement, Second, Torts states:

> Dangerous Conditions in Public Highway or Private Right of Way
>
> A possessor of land over which there is a public highway or private right of way is not subject to liability for physical harm caused to

travelers upon the highway or persons lawfully using the way by his [or her] failure to exercise reasonable care

> (a) to maintain the highway or way in a safe condition for their use, or
>
> (b) to warn them of dangerous conditions in the way which, although not created by him [or her], are known to him [or her] and which they neither know nor are likely to discover.

the valuation to $17,420, based on its conclusion that

> [t]he holding of title to property carries with it liabilities as well as benefits and in the instant case the holding of technical title to Ward Street by the taxpayer, even though the same was being used by the public as a public highway and perhaps an easement therefor had been acquired by the public, created the legal responsibility of upkeep, maintenance, and protection of the public against acts of negligence, whether of commission or omission.

*Id.* at 236 (internal quotation marks omitted). Reversing the tax appeal court, the Hawai'i Supreme Court stated, in relevant part, as follows:

> There appears to be some controversy between the taxpayer and the government in reference to their respective rights in the area comprising Ward Avenue but it is conceded by all that the municipal government is at present and for more than twenty-five years has been in possession and control of the area and during the entire period has maintained it as a public highway. In view of this fact the city and county would be solely liable for any damages sustained through failure to maintain the highway in a safe and proper condition. *Neither the owner of the fee of this nor any adjacent property could under such circumstances be required to respond in damages because of the unsafe or dangerous condition of the highway area so long as the same was in the possession and control of the city and county. It is the control and not the ownership which determines liability.* That the city and county is liable in damages for nonfeasance in failing to maintain a public highway in a reasonably safe condition so as to guard against injury to one lawfully traveling on the highway is settled in this jurisdiction.

33 Haw. at 236–37 (emphasis added and citations omitted).[14]

■ It has been stated that "[in] order to have the occupation or control of premises necessary to impose a legal duty with respect to the condition or use of those premises, one must ordinarily have the power and the right to admit individuals to the premises or to exclude them from the premises." *Id.* "[W]ithout control, the responsibility for the dangerous or hazardous condition cannot exist.... [A] party may not be held responsible for a condition which he or she did not cause and which he or she has no ability to remedy." *Rogers v. Omega Concrete Systems, Inc.*, 20 Kan.App.2d 1, 5, 883 P.2d 1204, 1207 (Kan.App.1994).

■ The issue of control or amount of control, unlike the issue of duty, is ordinarily a question of fact that should be left to the jury. *Sanchez v. City of Tucson*, 191 Ariz. 128, 130–31, 953 P.2d 168, 170–71 (Ariz.1998) (holding that "whether the City exercised enough control over the roadway to have a duty to install a traffic light would generally be a question of fact for the jury"). In this case, however, we conclude, for the following reasons, that Defendant Property Owners did not have any control over the privately owned road and, therefore, should not have to maintain or repair the privately owned road or warn travelers on the privately owned road of hazardous conditions on the privately owned road.

■ First, as discussed above, the Hawai'i Supreme Court has held that a private road platted on a subdivision map is impliedly dedicated to public use. Since the privately owned road in this case was platted on a subdivision map accepted for filing by the County, the privately owned road was impliedly dedicated to public use. Defendant Property Owners, therefore, had the same right to use the privately owned road as other members of the general public.

Second, HRS § 265A–1 (1993) vests authority in the counties to maintain and repair "private streets":

> **County authority.** The several councils or other governing bodies of the several political subdivisions of the State shall

---

**14.** We note that *Re Taxes Victoria Ward*, 33 Haw. 235 (1934), was decided by the Hawai'i Supreme Court prior to the passage of 1947 Haw. Sess. L. Act 142, which amended the Highways Act of 1892 to specifically provide that no surrender of a private road to a county shall be deemed to have taken place unless the road is accepted by the county's board of supervisors.

have the general supervision, charge, and control of, and the duty to maintain and repair, all county highways.... *Any other law to the contrary notwithstanding, the several counties by ordinance* may take over, or receive by dedication or otherwise, any private street or way or *may improve, grade, repair, or do any construction work upon private streets, ways, pavement[.]*

The County Council exercised its authority under the foregoing statute when it adopted Council Resolution No. 81–252, which established "a new policy for the maintenance of streets and roads in the City and County of Honolulu." (Capital format omitted.) In adopting the resolution, the Council stated, in pertinent part, as follows:

WHEREAS, it is in the public interest that the [County] maintain those streets and roads which serve the general public and are necessary for transportation purposes, whether publicly-owned or non-dedicated or non-surrendered; and

WHEREAS, the Department of Transportation Services has compiled a list of such streets and roads; and

WHEREAS, it is also in the public interest that the [County] provide remedial maintenance and/or resurfacing to other non-dedicated or non-surrendered streets open to the public; now, therefore,

BE IT RESOLVED by the Council of the [County] that . . . the following be, and hereby is, adopted as the new policy of the [County] for the maintenance of streets and roads in the [County]:

STREET MAINTENANCE POLICY

The [County] shall maintain the streets and roads in the [County] in the following manner:

1. Maintain by either remedial patching, resurfacing, or reconstruction, a) all City-streets, and b) those non-dedicated or non-surrendered streets shown in Exhibit A, with the exception of those streets maintained by other agencies or entities. (Exhibit A identifies those streets that serve the general public and are necessary for transportation purposes, including both publicly-owned and non-dedicated or non-surrendered streets.)

2. Maintain by either remedial patching or resurfacing, other non-dedicated or non-surrendered PAVED roads serving six (6) or more individually-owned parcels upon the request of abutting owners. If in the judgment of the Director and Chief Engineer, a pavement is in such poor condition that remedial patching is impractical and not cost effective, resurfacing may be provided. Remedial patching and resurfacing shall be as follows:

a) Asphalt concrete for asphalt concrete paved roads

b) Portland cement concrete or asphalt concrete for portland cement concrete paved roads.

3. Maintain other non-dedicated or non-surrendered UNPAVED roads serving six (6) or more individually-owned parcels with like materials, i.e., coral for coral, crushed rock for crushed rock, upon the request of abutting owners but subject to availability of equipment and manpower in the area.

4. No maintenance work shall be performed by the [County] on non-dedicated or non-surrendered roads which are so marked or delineated as to exclude the general public.

5. No maintenance work shall be performed by the [County] on non-dedicated or non-surrendered roads which are part of a cluster development, planned development, or similar type of development.

6. No maintenance work shall be performed by the [County] on streets that the developer or subdivider has declared his intention not to dedicate to the [County] as provided in the subdivision rules and regulations.

(Underscored emphasis in original.) Pursuant to the foregoing resolution, the County, at AOAO's request, resurfaced the privately owned road in question.

Third, the legislature has expressly authorized the various counties to regulate and

control traffic over private streets such as the privately owned road in question. Specifically, HRS § 46–16 (Supp.2001) provides, in relevant part:

**Traffic regulation and control over private streets.** Any provision of law to the contrary notwithstanding, *any county and its authorized personnel may impose and enforce traffic regulations and place appropriate traffic control devices, and may enforce chapters 286* [15] *and 291C,* [16] *on the following categories of private streets, highways, or thoroughfares,* except' private roads used primarily for agricultural and ranching purposes:

(1) *Any private street, highway, or thoroughfare which has been used continuously by the general public for a period of not less than six months;* provided that the county shall not be responsible for the maintenance and repair of the private street, highway, or thoroughfare when it imposes or enforces traffic regulations and highway safety laws or places or permits to be placed appropriate traffic control devices on that street, highway, or thoroughfare; provided further that no adverse or prescriptive rights shall accrue to the general public when the county imposes or enforces traffic regulations and highway safety laws or places appropriate traffic control devices on that street, highway, or thoroughfare; nor shall county consent to the placement of traffic control signs or markings on a private

street be deemed to constitute control over that street[.]

(Emphases and footnotes added.)

In accordance with the foregoing authority, the County Council adopted a Traffic Code to regulate traffic in the County. I Revised Ordinances of Honolulu (ROH) chapter 15 (1990 & Supp.1995). ROH § 15–1.1 (1990 & Supp.1995), entitled "Purpose of ordinance[,]" articulates the purpose of the Traffic Code as follows:

*The provisions hereinafter set forth are to provide for the regulation of traffic upon* the public streets of the [County]; and *such private streets, highways or thoroughfares which for six months or more have been continuously used by the general public ... as provided in HRS Section 264–1 and are open for public travel but have not yet been accepted by the [County],* except private roads used primarily for agricultural purposes; and for bicycle paths constructed on easements granted to the [County], and this chapter may be cited as the traffic code (1990) of the [County].

(Emphases added.)

Thus, the County Council has, in the public's interest, undertaken to maintain, repair, and regulate traffic upon privately owned roads that have been held open for travel by the general public for at least six months, provided the privately owned roads meet the requirements set forth in the statutes and ordinances discussed above.[17] Consistent

---

15. HRS chapter 286 is referred to as the "Hawaii Highway Safety Act."

16. HRS chapter 291C is referred to as the "Statewide Traffic Code."

17. We observe that other county councils have adopted similar ordinances that allow a county to regulate traffic on private streets. For example, Section 24.2 of the Hawaii County Traffic Code states, in relevant part, as follows:

**Scope and applicability of chapter and of Statewide Traffic Code.**
(a) The provisions set forth in this chapter are to provide for the regulation of traffic in the County of Hawaii, upon the following:
(1) The public streets of the [c]ounty;
(2) Such private streets, highways, and thoroughfares:

(A) Which have been continuously used by the general public for more than six months, and designated by the council, or
(B) Which are intended for dedication to the public use as provided in section 264–1, HRS, and are open for public travel but have not yet been accepted by the [c]ounty; and

. . . .

(c) Pursuant to the authority delegated to the [c]ounty by Act 173 of 1995, all streets that have been used by the general public for a period of more than six months are hereby designated by the council to be subject to the provisions of chapter 291C of the [HRS], known as the Statewide Traffic Code," and this chapter.
(d) The [c]ounty shall not be responsible for the maintenance and repair of any private street, highway, or thoroughfare when it imposes or

with this regulatory authority, the record indicates that when AOAO had "no parking" signs installed on the triangular landscaped area across the privately owned road from the SV, the County warned AOAO that the signs would be removed, unless authorization for the signs to remain was obtained from the County's Chief Engineer.

In light of the foregoing circumstances, it seems apparent that the County, and not Defendant Property Owners, had control over the privately owned road. It would not be fair or logical under such circumstances to impose a duty on Defendant Property Owners to maintain or repair the road or warn travelers of hazardous conditions on the road.

### D. The Denial of the Yoshidas' Motion for Summary Judgment on Grounds That the HRUS Absolved Them of Liability to Jade

In their cross-appeal, the Yoshidas argue, *inter alia*, that: (1) the HRUS should be broadly construed to protect landowners who permit recreational use of their land from liability, and exceptions to the HRUS should be narrowly construed; (2) they directly or indirectly permitted Jade to enter the privately owned road, in which they owned an interest, for recreational purposes; (3) the undisputed record establishes without any genuine controversy that Jade entered the privately owned road for recreational purposes before she was injured; and (4) no exception to HRUS immunity exists.

The purpose of the HRUS is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." HRS § 520–1 (1993). At the time this lawsuit was filed, the HRUS limited the liability of an owner of land "who either directly or indirectly invite[d] or permit[ted] without charge any. person to use the property for recreational purposes[.]" HRS § 520–4

(1993). Specifically, the HRUS provided at the time that "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes[.]" HRS § 520–3 (1993).

In light of our conclusion that the privately owned road in question was a public easement open for use by the general public, including Jade, and that the County, not the Yoshidas, had control over the privately owned road, we conclude that the Yoshidas could not have directly or indirectly invited Jade to enter upon the privately owned road for recreational purposes so as to qualify for immunity under the HRUS.

Accordingly, we affirm the order of the circuit court, denying the Yoshidas' motion for summary judgment.

### CONCLUSION

Based on the foregoing discussion, we affirm: (A) the February 7, 1995 "Order Granting (1) Defendants Association of Apartment Owners of Summer Villa and Fidelity Management, Inc.'s Motion for Summary Judgment Filed on October 24, 1994; (2) Third–Party Defendants Hideo Yokota and Kiyoko Yokota's Joinder in Defendants Association of Apartment Owners of Summer Villa and Fidelity Management, Inc.'s Motion for Summary Judgment Filed on October 24, 1994, Filed on November 30, 1994; (3) Third–Party Defendants Kim Mau, Gordon F. Liu, and Annette K. Liu's Joinder in Defendants Association of Apartment Owners of Summer Villa and Fidelity Management, Inc.'s Motion for Summary Judgment Filed on October 24, 1994, Filed on December 6, 1994; and (4) Defendants Richard T. Yoshida and May H. Yoshida's Partial Joinder in Defendant Association of Apartment Owners of Summer Villa and Fidelity Man-

---

enforces traffic regulations and highway safety laws or places or permits to be placed appropriate traffic control devices on that private street, highway, or thoroughfare.

Similarly, Section 16.1.1 of the Kauai County Traffic Code, Chapter 16 of the Kauai County Code (1987), provides: *"The provisions of this Chapter are to provide for the regulation of traffic upon the public streets of the County of Kauai, and private streets, highways, or thoroughfares, which for more than five (5) years have been continuously used by the general public."* (Emphases added.)

agement, Inc.'s Motion for Summary Judgment Filed on October 24, 1994, Filed on December 7, 1994"; (B) the September 23, 1994 "Order Denying Defendants Richard and May Yoshida's Motion for Summary Judgment Filed March 29, 1994"; (C) the "First Amended Final Judgment," filed on April 13, 1998; and (D) the April 28, 1995 "Order Denying Plaintiff Jade Wemple's Motion for Reconsideration of 'Order Granting Defendants Association of Apartment Owners of Summer Villa and Fidelity Management, Inc.'s Motion for Summary Judgment Filed on October 24, 1994, Etc.' Entered Herein on February 7, 1995, Filed on February 17, 1995[.]"

We do not address in this opinion whether a county's exercise of authority to repair or maintain a privately owned road open to the public but not accepted by the county council as a "county road" pursuant to HRS § 264–1 exposes the county to liability for negligent repairs or maintenance of such privately owned roads. The County was not sued in this case and the issue has never been presented.